# EXHIBIT A

5027-9



RECEIVED
2
HILL BETTS & NASH LLP

# EXHIBIT A

CONFIDENTIAL STEVEDORING RATE SCHEDULE FOR ECUADORIAN LINE

Dated: October 1, 2005

Between NEW YORK CONTAINER TERMINAL, INC. (the "Contractor") and SOUTH PACIFIC SHIPPING CO. LTD. (D/B/A ECUADORIAN LINE)(the "Carrier")

I.  **STEVEDORING RATES**

### PALLETIZED BANANAS/FRESH FRUIT

#### Per Box Rate

| | |
|---|---|
| 10/01/05-09/30/2006 | $.49 ½ |
| 10/01/06-09/30/2007 | $.50 ½ |
| 10/01/07-09/30/2008 | $.50 ½ |
| 10/01/08-09/30/2009 | $.52 |
| 10/01/09-09/30/2010 | $.53 |

Carrier also has the option to extend the contract for an additional five years, through 2015, at rates mutually agreed upon.

The above rates include straight time labor costs from the hold of the vessel through to the truck. This rate includes all costs associated with unloading perishable cargoes from the vessel to the warehouse, storage in a dedicated refrigerated warehouse facility, and the loading of the product onto your customer's trucks.

New York Container Terminal is committed to safe and quality cargo handling. We will maintain ongoing quality improvement programs and we will constantly monitor our productivity and damage levels and train our employees on the proper way to handle refrigerated cargoes.

The above rates include wharfage and will permit straight time stevedoring from the hours of 0800 until 1700 excluding 1200 to 1300 from Monday through Friday, exclusive of holidays. A list of holidays is included along with our hiring guidelines.

Based on current pro forma, vessel will have two days to complete work.  Terminal reserves the right due to extraordinary and special

**CONFIDENTIAL RATE SCHEDULE FOR ECUADORIAN LINE**        PAGE    2
DATED:  October 1, 2005

circumstances to require the vessel to finish in one day.

The rates quoted are predicated on a pallet friendly vessel which allows for the use of four electric fork lift trucks in the hatch and ship's cranes or derrick with minimum eight metric ton lifting capacity. At least one-half of each hatch square is to be pre-slung.

In the event that the Carrier must charter vessels with less than eight ton gear, Contractor will allow the Carrier three ships per year with gear down to five metric ton capacity at the normal rates set forth in this Exhibit A. Beyond these three ships, or for ships with gear under five ton capacity, Contractor will receive a rate differential which will compensate it for the resultant loss in productivity. The rate differential will be based on crane lifting capacity and will be applied as follows:  Actual productivity to be compared to the average adjusted gross productivity of the last ten (10) vessels to determine excess time required to work the vessel. Any additional time versus that calculated at average productivity will be charged to Carrier at Detention Rates.

## CONTAINERS

| YEAR | LOAD | EMPTY | |
|------|------|-------|---|
| 10/01/05-09/30/2006 | $197.00 | $192.00 | per lift |
| 10/01/06-09/30/2007 | $204.50 | $199.50 | per lift |
| 10/01/07-09/30/2008 | $204.50 | $199.50 | per lift |
| 10/01/08-09/30/2009 | $207.00 | $202.00 | per lift |
| 10/01/09-09/30/2010 | $210.00 | $204.00 | per lift |

Security Fee                              $4.00 per loaded
                                          container

Lashing of containers, if applicable      $7.00 per unit

Restowing container at Carrier's request:  $148.00 per lift

Overheight/overwidth/overlength or
damaged containers which can only be lifted by emergency gear
is to be billed at pick rate plus Extra Labor/Detention basis

Transshipment of loaded containers discharged from another

**CONFIDENTIAL RATE SCHEDULE FOR ECUADORIAN LINE**                    **PAGE**   3
DATED: October 1, 2005

vessel,reloaded to another vessel or barge at New York Container
Terminal                                          $165.00 per unit

Gang Rollover (Receiving vessel only)          ½ hour Detention rate


Inclusions:

The above box rates are quoted on a per move basis and include the
following:

1. Above rate includes stevedoring, on straight time, crane rental,
tractors, top loaders, assisting in receiving and delivery,
clerking and checking, weighing of export containers, furnishing
stowage plans including a final, T.I.R. gate inspection and
reports, security and wharfage. The rates quoted above are based on
a semi-wheeled operation. Normal gate operating hours will be from
0600 until 1630 for containers and banana trailers and 0800 until
1630, excluding 1200 to 1300, for break bulk and LCL loads other
than banana trailers.  Carrier to have the ability to preload and
stage trailers of product on the facility at any hour of the day or
night (including weekends and holidays) consistent with terminal
and maritime security policies and conditions that are in place at
that time.

2. Loading/unloading of containers on/off vessel using a shore
container gantry crane to/from a point of rest in the yard.

3. Yard and office support while vessel is working.

4. Gate, TIR, mounting/grounding for vessel related cargo during
regular terminal hours.

5. The cost of standby for vessel, detention and dead time of
vessel gangs or any delays incurred which are beyond the control of
the Contractor are excluded from the above listed basic service and
will be charged at the rate set forth in Section VII hereof.



6. All shore side handling equipment necessary for yard and vessel
operations inclusive of two shore side container gantry cranes.

7. Inbound TIR inspection of Carrier's equipment.

8. Included in the rate is terminal storage for empty containers up
to 425 units per day.  When allowance has been reached, Carrier
shall pay $1.60 per container/per day.

**CONFIDENTIAL RATE SCHEDULE FOR ECUADORIAN LINE**
**DATED: October 1, 2005**

PAGE   4

9. Included in the rate is terminal storage for up to 35 trailers per day. When allowance has been reached, Carrier shall pay $75.00 per trailer/per day. For trailer to be left on terminal, trucker must sign hold harmless and indemnification agreement.

10. Compensation, Public Liability and Property Damage Liability, as well as all other Federal and State Insurances. New York Container Terminal agrees to maintain in full force and effect all insurance policies and will, upon request, provide copies of all insurance certificates.

11. The Carrier will be responsible for any unfunded pension liability which might accrue to the vendor through its collective bargaining agreements, as the result of services provided to Carrier hereunder.

<u>Exclusions:</u>

1. Detention will be billed, on a per gang-hour basis, for any nonproductive time. The first fifteen minutes of detention per gang on any ship will be free.

2. Repair of containers or chassis excluding Roadability inspection. The Carrier can supply its own parts or Contractor will provide them. Contractor will provide the Carrier with a parts catalog.

3. Late Gate and/or weekend, holiday gates for containers, when requested by the Carrier, will be billed in accordance with ILA manning requirements.

Costs for Gate while vessel working (Mon ▌ Fri):        $7,900.00
Above rate based on 4 hour operation, 5:00pm ▌ 9:00pm

Costs for Gate during non-vessel operation (Mon ▌ Fri):$ 17,000.00
Above rate based on 4 hour operation 5:00pm ▌ 9:00pm

Costs for Gate during non-vessel operation (Weekends / Holidays):
Based on 4 hour operation                              $ 17,500.00

4. The rate does not include demurrage. Demurrage rates will be based upon New York Terminal Tariff Rates. Contractor will honor

**CONFIDENTIAL RATE SCHEDULE FOR ECUADORIAN LINE**              PAGE  5
DATED: October 1, 2005

Carrier's service contracts up to 21 calendar days where applicable. Export demurrage, after 7 calendar days free time, will be billed to the account of the Carrier. For containers released to General Order, where demurrage and/or exam liens remain unpaid for more than 30 days from date of delivery, said charges shall be the responsibility of the carrier.

5. The rate does not include New York Shipping Association royalties, assessments and or any royalties, assessments or fines if applicable, which will be direct cost to Carrier.

6. If a gang is ordered to handle containers after break bulk operation is finished, carrier is responsible for any and all stand-by/detention time associated with this activity. (15 minutes free is excluded from this scenario.) Terminal will make best effort to minimize standby cost of labor which would otherwise be employed during non-productive time.

7. Any platform/warehouse activity that is required on overtime hours will be billed in accordance with the ILA manning requirements. (I.e. non vessel related activity)

8. In the event Carrier cancels a labor order which has been previously placed, Carrier remains liable for all labor costs which can not be either cancelled or set back.

## II. TERMINAL ACTIVITIES

### A.    Reefer Operations

Up to 160 reefer plugs will be made available to accommodate the Carrier's needs for first six months of contract. Thereafter 175 reefer plugs will be made available.

Reefer Plug Service/Monitoring/Electric:

∎S/T First day plug in/Monitoring
                                    $61.94 per container per day
∎Each subsequent day monitoring
     -includes electric      $53.11 per container per day

-Boxes to be monitored twice per day.

**CONFIDENTIAL RATE SCHEDULE FOR ECUADORIAN LINE**          PAGE   6
**DATED:  October 1, 2005**

Pre Trip (test only on line's request)          $96.84 per unit

Pre Trip and Precool including placement         $121.97 per unit
                                                 (pass or fail)

Reefer Wash-Out                                  $64.54

Genset Pre Trip                                  $96.84

Fuel                                             At cost, plus 15%

Note: Pigtails to be supplied by lines


B.   TIR/MOUNT/GROUND

Miscellaneous  TIR  and  Mount/Ground  charges,  if  required  for
containers  not  associated  with  vessel  moves  and  authorized  by  the
Carrier:

     -Miscellaneous TIR, i.e., IT moves, etc.     $27.00 per TIR
     -Miscellaneous Mount/Ground                   $42.00 per move

C.   Import In for Re-Delivery or Export load received for vessel
     but canceled and delivered from terminal.   $75.00 per unit


D.   Receiving/Delivery of empty containers not related to
     thru-put discharge or load, vessel move.    $42.00 per unit/
                                                       per gate
                                                       move

E.   Container handling charge for container or cargo
     inspection/survey includes spotting with CY door
     opening/closing and resealing.
                                     Per Terminal tariff

F.   Chassis Change                              $40.00 per unit

G.   Booking Rollovers:
     Admin Fee                                   $35.00 per unit
     (Includes holding containers for US Customs Exams)

H.   Change of container Status (Off Hire / For Sale)to Good Order
     or Bad order:                               $45.00 per unit

**CONFIDENTIAL RATE SCHEDULE FOR ECUADORIAN LINE**          PAGE    7
**DATED: October 1, 2005**

I.    Physical movement of containers due to booking rollover or
      status change:                                  $45.00 per unit/
                                                       Per lift

J.    Administration Fee for cancellation of Demurrage:
                                                       $35.00 per unit

III.  <u>CFS ACTIVITIES</u>

A.    <u>Containers ∎ Stuffing / Stripping</u>
      <u>Fruit Products</u>

      Bananas/Plantains 20'/40'              $335.00 per container
      Pineapples/mangoes 20'/40'             $450.00 per container
      Overnight stuffers to be delivered
      as FCL                                 $160.00 per container

B.    <u>Containers</u>
      <u>Strip and Swing</u>

      Palletized/Unitized/20 ft. containers  $377.15 per container
      Palletized/Unitized/40 ft. containers  $630.40 per
container

C.    <u>Strip and Swing</u> (unitized cargo)

      Loose floor loaded cargo/20 or 40 foot container $3.72wt

**CONFIDENTIAL RATE SCHEDULE FOR ECUADORIAN LINE**                    **PAGE** **8**
DATED: October 1, 2005

There will be a minimum charge of $187.50 per container. The maximum charges will be $617.46 for a 20 foot container and $910.57 for a 40 foot container.

Strip and swing rates will include all receiving charges and will be predicated on moving the cargo directly from a container into the customer's waiting truck.

D.    Stuffing/Stripping-General Cargo

Rate includes assisting receiving/delivery and normal securing and materials used (Chocking and Bracing).

| | | |
|---|---|---|
| 20' | $428.88 per unit |
| 40' | $657.34 per unit |

E.    Stuffing
Autos▌ stuffing into 40' containers      $189.44 per vehicle
▌ includes prep of vehicles, normal securing, Carrier to provide securing materials.

F.    Government Inspections (if for account of the Carrier)

USDA Tailgate Inspection                      $154.00 per unit*
(This refers to container being taken to LCL warehouse
platform for inspection by AQI at request of carrier.)

VACIS Exam                                    $328.00 per unit*

* If the above activity pertains to refrigerated containers an addt'l reefer handling fee for plugging/unplugging will apply at the rate of:                      $43.00 per unit

USDA Strip or Stuff Inspection
-Strip and Stuff-Palletized/Unitized 20 ft. containers

| | | |
|---|---|---|
| Full Stripping | $474.14 per container |
| Partial Stripping | $341.60 per container |

-Strip and Stuff-Palletized/Unitized 40 ft. containers

**CONFIDENTIAL RATE SCHEDULE FOR ECUADORIAN LINE**          PAGE    9
**DATED:  October 1, 2005**

|  |  |  |
|--|--|--|
| Full Stripping | $707.98 per container |
| Partial Stripping | $571.10 per container |

G.  Loading flat racks, open tops, over-size pieces, chocking and bracing at cost and material.

                                        Extra Labor basis

H.   Strip and Sort pallets by size, type container $336.21 per 20′container

   Strip and Sort pallets by size, type        $502.16 per 40′
   container

IV. <u>BREAKBULK CARGO</u>

        A. Stevedoring: Extra Labor Basis
        B. Terminal:    $17.50 per 2240 lbs. or 40 CFT, whichever is
                        greater

V.   <u>MAINTENANCE</u>

        A. Installing or removing gen. set    $47.74 per unit on
           including drayage.                 $47.74 per unit off

        B. FHWA inspection                     $65.84 per unit

        C. Genset PM                          $161.38 per unit

Carrier agrees to engage Contractor for all maintenance and repair to be performed at the terminal upon Carrier's containers, chassis, reefer units and generator sets pursuant to terms, conditions and rates to be mutually agreed upon.


Tires-
-Fixing a flat                              See catalog
-Repair of tire/dismount/mount              See catalog


Welder/Burner/Mechanic                      $63.50 per man hour

Mechanic-Electrical Problems-time and materials

**CONFIDENTIAL RATE SCHEDULE FOR ECUADORIAN LINE**          PAGE  **10**
**DATED:  October 1, 2005**

$63.50 per man hour

Storage of damaged or OOS equipment in excess of 30 calendar days
without authorized approval for repairs:     $3.00 per unit/per day

DOCKAGE (LOA)- Per Port Authority tariff. (Subject to increases
per Port Authority)

| | |
|---|---|
| Under 400 | $3.75 per foot per day |
| 401-500 | $4.50 per foot per day |
| 501-600 | $5.25 per foot per day |
| 601-700 | $6.50 per foot per day |
| 701-800 | $7.25 per foot per day |
| 801-900 | $7.75 per foot per day |

VI. <u>MISCELLANEOUS ACTIVITIES</u>

   A. Handling ship's lines on overtime: (No charge for docking
     and undocking on straight time)
     [Straight-time is 0800 to 1700 hrs. on week days
     excluding 1200 to 1300 hrs.]

| **WEEKDAYS:** | <u>Docking</u> | <u>Undocking</u> |
|---|---|---|
| 0700 ▮ 0800 | $ 985.00 | $ 985.00 |
| 1200 ▮ 1300; 1700 - 1900 | $1250.00 | $1250.00 |
| 1900 - 0700 | $1400.00 | $1400.00 |
| WEEKENDS: | $1900.00 | $1900.00 |

Once vessel lets go, line handling period has ended.   If
vessel returns, new line handling period shall commence.

   B. Heavy lift charges:

     Heavy lifts up to a maximum of 40 LT billed at extra
     labor which covers stevedoring and terminal. Any lifts
    exceeding 40 LT must be by prior special arrangement.

**CONFIDENTIAL RATE SCHEDULE FOR ECUADORIAN LINE**                    **PAGE   11**
**DATED:  October 1, 2005**

    C. Handling vessel stores                    Extra labor

    D. Potable water for the vessel is available at 50¢ per
       metric ton. There will be no hookup charge if crew
     performs this service.

    E.  <u>Equipment</u>                    <u>Extra Labor Basis Hourly Charges</u>

        Container Crane                    $511.86 per hour
        Container Top loader               $ 85.13 per hour
        Forklift up to 8,000 lbs.          $ 17.24 per hour
             up to 15,000 lbs.       $ 24.25 per hour
             up to 25,000 lbs.       $ 34.48 per hour
             over 25,000 lbs.        $ 46.93 per hour
        Yard Tractor                       $ 39.87 per hour
        Flatbed                            $ 11.85 per hour

**CONFIDENTIAL RATE SCHEDULE FOR ECUADORIAN LINE**       PAGE  **12**
**DATED: October 1, 2005**

## VII. MAN-HOUR RATE SCHEDULE

Ship's Gang &
Terminal Unit Rates: Extra Labor  Detention  O/T Diff.  M/H Diff.

Per Gang Employed    $1,838.79    $1,666.25   $1,193.80  $2,268.25
including staff & equipment

Extra Labor gang hour rate is applicable when cargo other than
❚standard❚ containers are discharged or loaded to/from vessels.

Lashing rates may be applicable on cargo requiring extra labor
activities.

The extra labor rates do not include equipment which will be
charges in accordance with Section VI; Item F.

| Man-hour Rates: | S/T | O/T | M/H | O/T Diff. | M/H Diff. |
|---|---|---|---|---|---|
| Terminal/ Warehouse Labor | 60.20 | 87.08 | 108.58 | 26.88 | 48.38 |
| **Reefer Maintenance:** | | | | | |
| Foreman | 65.50 | 98.00 | 127.00 | 32.50 | 61.50 |
| Mechanic | 64.50 | 96.00 | 125.00 | 31.50 | 60.50 |
| **Chassis/Cont. Repair:** | | | | | |
| Foreman | 63.80 | 95.00 | 126.60 | 31.20 | 62.80 |
| Mechanic | 62.80 | 93.00 | 124.60 | 30.20 | 61.80 |
| **Crane/Power** | | | | | |
| Foreman | 58.00 | 83.00 | 103.00 | 25.00 | 45.00 |
| Mechanic | 54.00 | 79.00 | 99.00 | 25.00 | 45.00 |
| **Lashing/Extra Labor** | | | | | |
| Foreman | 63.80 | 95.00 | 126.60 | 31.20 | 62.80 |
| Lasher | 62.80 | 93.00 | 124.60 | 30.20 | 61.80 |
| **Lashing/Detention** | | | | | |
| Foreman | 63.80 | 95.00 | 126.60 | 31.20 | 62.80 |
| Lasher | 62.80 | 93.00 | 124.60 | 30.20 | 61.80 |

CONFIDENTIAL RATE SCHEDULE FOR ECUADORIAN LINE            PAGE   13
DATED:  October 1, 2005

For prices of parts and standard allotment of time on lenses,
bulbs, mud flags and sealed units (marker, stop and tail), please
see our maintenance and repair catalog provided separately.

Plugging and unplugging containers on/off vessel will be performed
on extra labor basis at the following man hours rates: (Minimum 4
hours; 2 men)

Straight time:      Per man hour        $63.80
Overtime:           Per man hour        $95.00
Meal Hour:          Per man Hour        $126.60

VIII. <u>DOCUMENTATION</u>

Carrier shall provide Contractor all necessary information and
instructions on a timely basis to allow Contractor to provide
efficient service.  Documentation shall be prepared and processed
by the Contractor in a form mutually agreed upon by the Carrier and
Contractor.  In connection with the above, the Contractor   shall
prepare the following documentation:

    1. Outbound vessels stowage plan
    2. Ship's loading report
    3. Ship's discharge report
    4. Daily records of equipment interchange reports (via internet)
    5. Daily container activity report (in and out)
    6. Outbound container load plans for LCL containers
    7. List of undelivered LCL cargo following vessels expiration of
       free time
    8. List of undelivered FCL (containers) following vessels
       expiration of free time
    9. Daily warehouse platform delivery reports
    10. Daily strip and swing and/or stripping/stuffing recap reports
    11. Banana warehouse inventory report

IX. <u>LABOR RATE ESCALATION</u>

**CONFIDENTIAL RATE SCHEDULE FOR ECUADORIAN LINE**            PAGE   14
DATED: October 1, 2005

The labor portion of the above rates for palletized bananas and
fresh fruit is 70% and the fixed portion is 30%. The labor portion
of the above rates for containers is 70% and the fixed portion is
30%. The labor portion is subject to escalation based on increases
or decreases in wages, taxes, fringe benefits, etc. Thereafter it
shall be subject to an increase mutually agreed to based on actual
cost increases. The fixed portion of all rates shall be adjusted
annually on October 1st for all NYSA/ILA related rates and January
1st for all METRO/ILA related rates, respectively based on
percentage increases in the Consumer Price Index (CPI) as published
by the Department of labor for the New York Metropolitan area.


ORDERING TIMES AND STARTING TIMES; STRAIGHT, OVERTIME, ETC.:
❚ Monday thru Thursday ordering by 1 p.m. for same day 1900 or 2300
and for next, 0700, 0800 or 1300.
❚ Friday ordering by 1 p.m. for same day 1900 and 2300, Saturday
0700 , 0800 1300 or 1900, Sunday 0700, 0800, 1300, 1900 or 2300 and
Monday 0700, 0800 or 1300.
❚ Straight time is from 0800 to 1200 and 1300 to 1700 Monday thru
Friday, excluding Holidays.

CANCELLATION AND SET BACK SCHEDULES:
❚ Sunday 0800 start can be cancelled or set back by 0600 Saturday.
❚ Monday 0800 start can be cancelled or set back by 0600 Monday.
If Monday is a holiday, Tuesday 0800 start will apply.
   All other labor orders can not be cancelled or set back after
being ordered.


THE FOLLOWING ARE THE N.Y.S.A. - I.L.A. ❚ PAID HOLIDAYS❚ :


                          Columbus Day

**CONFIDENTIAL RATE SCHEDULE FOR ECUADORIAN LINE**          PAGE    15
**DATED:  October 1, 2005**

Election Day

Veterans Day

Thanksgiving Day

Christmas Eve

Christmas Day

New Year's Eve

New Year's Day

Martin Luther King's Birthday

Lincoln's Birthday

Washington's Birthday

Gleason's Birthday

Good Friday

Memorial Day

Independence Day

Labor Day

**CONFIDENTIAL RATE SCHEDULE FOR ECUADORIAN LINE**
**DATED: October 1, 2005**

PAGE   16

The foregoing is hereby acknowledged and agreed to, subject to the execution of the Contract:


SOUTH PACIFIC SHIPPING CO.
LTD. (d/b/a ECUADORIAN LINE)
(Carrier)

By: _____
    Diogenes Villacis

Title: President, South Pacific Shipping Co., Ltd.

Date: December 5th, 2006


NEW YORK CONTAINER
TERMINAL, INC.
(Contractor)

By: _____

Title: VICE PRESIDENT

Date: December 26 2006




RECEIVED
2
HILL BETTS & NASH LLP

## TERMINAL OPERATING, STEVEDORING AND CFS SERVICE AGREEMENT

THIS AGREEMENT, made and entered into as of the ___ day of April, 1997 by and between **HOWLAND HOOK CONTAINER TERMINAL, INC**. a corporation organized and existing under the laws of the State of New York (hereinafter the "Contractor"), and **SOUTH PACIFIC SHIPPING COMPANY LIMITED (d/b/a ECUADORIAN LINE)**, a corporation organized and existing under the laws of Bermuda (hereinafter the "Carrier").

### SECTION I. UNDERTAKINGS AND CONSIDERATION

In consideration of the covenants and undertakings of Carrier as hereinafter set forth, the Contractor agrees to provide and perform, at its marine terminal facility located in the Port of New York at Staten Island (hereinafter the "Terminal"), terminal, stevedoring and break/bulk LCL cargo (including palletized fresh fruit) handling, and Container Freight Station services, for break/bulk cargo and containers to be loaded onto or discharged from vessels owned, operated, chartered or controlled by the Carrier (hereinafter "Carrier's vessel") used by the Carrier for service between various ports and the Port of New York. The Carrier agrees to utilize exclusively, the Contractor's terminal for all of the above described services it requires in the Port of New York, for the term of this agreement.

### SECTION II. CONTRACTOR'S OBLIGATIONS

The Contractor undertakes to furnish the following services at the agreed rates set forth in the Rate Schedule attached hereto as Exhibit "A" and made a part hereof.

#### 2.1 GENERAL

(1) A single berth, located at the south end of the wharf, of adequate length to dock Carrier's vessel is guaranteed upon arrival, Wednesday, Thursday and Friday. On any other day, vessel will be given priority for a berth, and at least one crane will be made available. This guarantee would not apply to a second vessel simultaneously, however Contractor will make every effort to make a second berth available should Carrier require it. Actual vessel starting times are subject to the prevailing rules of the NYSA/ILA collective bargaining agreement.



 **HOWLAND HOOK**

**TERMINAL AGREEMENT; HHCTI & ECUADORIAN April 29, 1997 Page 2**

(2) Adequate yard space for receiving, delivering, parking, sorting, consolidating and handling loaded and empty containers on chassis and without chassis, as required.

(3) Shoreside container gantry cranes suitable to handle containers up to 40 ton capacity. Contractor guarantees immediate availability of 2 cranes upon arrival of Carrier's vessel, Wednesday, Thursday and Friday. On any other day, vessel will be given priority for a berth, and at least one crane will be made available. Additional cranes if available, shall be provided upon Carrier's request. This guarantee does not apply to a second vessel simultaneously, however Contractor will make every effort to make cranes available for a second vessel should Carrier require it. Actual vessel starting times are subject to the prevailing rules of the NYSA/ILA collective bargaining agreement.

(4) Adequate warehouse space, temperature and humidity controlled, adequate handling equipment and personnel in the on-dock container freight station to accommodate Carrier's LCL and perishable cargo requirements, including truck loading.

(5) Contractor shall provide labor, supervision, normal watching service and terminal services.

(6) Contractor shall perform stevedoring services on a 24 hour, 7 day a week basis, consistent with the ILA collective bargaining agreement and the customs and practices currently existing within the Port.

(7) **Truck Turn Time** – With respect to receiving and delivery of full or empty containers, Contractor guarantees a daily average truck turnaround time of 45 minutes per transaction, assuming all documentation is in order, and no extreme weather conditions. Contractor will pay applicable detention charges in the event it shall fail to provide 45 minute service. Detention charges as defined in the Howland Hook Marine Terminal Tariff No.1, shall be billed directly to Contractor.

**2.2  STEVEDORING**

(1) Planning the stowage of uncontainerized cargo and containers on board Carrier's vessels in accordance with the instructions of Carrier's representative, including preparing and furnishing to the Carrier appropriate preliminary and final stowage plans and summaries and data for stability calculations prior to the sailing of vessels.






**TERMINAL AGREEMENT;   HHCTI & ECUADORIAN   April 29, 1997 Page 3**

(2) Discharging containers from vessels and moving containers to a point of rest in the yard or in the stack; and moving containers from a point of rest to the wharf and loading same onto vessels.

(3) Opening and closing hatches and cells, the covers of which are to be fitted with ISO fittings to accommodate standard container spreaders.

(4) Checking and tallying containers and seals, notating any damages to containers or seals upon discharge and having vessel sign for same, onto and off of vessels, and shifting containers on board vessels.

(5) Berthing and spotting of vessels, including the necessary labor to handle lines charged in accordance with Exhibit A. Pilotage and tugs shall be arranged and paid for by the Carrier.

(6) Lashing/Unlashing of containers on vessels shall be provided by the Contractor, if requested by the Carrier, pursuant to rates set forth in Exhibit A.

(7) Howland Hook will work in any reasonable weather condition, including moderate rain and snow, which will still permit safe cargo operation, subject to the permission of the Master of the vessel or the Carrier's Representative.

### 2.3   CONTAINER YARD ACTIVITY

(1) Planning layout of containers in terminal yard and providing Carrier with on-hand dock receipt tally report.

(2) Sorting and consolidating in accordance with Carrier's operating requirements.

(3) All necessary maintenance, sanitary, janitorial and clean-up services at the wharf, in the container yard and in the container freight station and the warehouse.

### 2.4   GATE ACTIVITY

(1) Receiving and delivering loaded and empty containers on chassis to a point of rest in the yard.



 **HOWLAND HOOK**

**TERMINAL AGREEMENT; HHCTI & ECUADORIAN    April 29, 1997    Page 4**

(2) Checking and recording seal numbers of loaded containers on forms approved by Carrier.

(3) Weighing export loads and reporting results to the Carrier.

(4) Visual inspection of container condition and preparation and issuance of TIR forms at Contractor's gate, and reporting to the Carrier any noted damage or defect.

## 2.5    REFRIGERATED WAREHOUSE FACILITY/CONTAINER FREIGHT STATION SERVICE

(1) Contractor to furnish all labor, supervision, equipment, pallets, normal watching service and incidentals in connection with the operation of the Container Freight Station.

(2) Transportation of containers between the container yard, the wharf and the Container Freight Station as required, as per Exhibit A.

(3) Howland Hook will provide 66,400 square feet of dedicated warehouse space (at least 50,000 square feet of which shall be refrigerated) in which to store Ecuadorian Line's cargo. The warehouse will consist of four-12,480 ft² rooms with one room subdivided into two X 6,240 ft² rooms. There will be four doors on the shipside parallel to hatch openings and four doors on the land side. The height of the warehouse should be sufficient to convert to a rack system for a second level of pallets. The rent for this facility will be included in the above per box stevedoring rate. The warehouse shall be constructed in accordance with the plans and specifications approved by Carrier prior to execution of this Agreement, and shall be located adjacent to the guaranteed berth for Carrier's vessels. Construction of the warehouse shall be completed in accordance with the schedule set forth in Exhibit B hereto.

(4) All refrigerated rooms will have humidification capabilities in order to further protect the quality of the cargo.

(5) Electricity or other power for the refrigerated facility will be for the account of Ecuadorian Line and will be submetered.

**FUTUREPORT NY**



**TERMINAL AGREEMENT; HHCTI & ECUADORIAN April 29, 1997   Page 5**

(6) Maintenance for the warehouse (including the refrigeration plant) and the storage buildings are included in the per box stevedoring rate.

(7) Twenty-four hour gate security with roving patrols.

(8) Ecuadorian Line will have the ability to pre-load and stage trailers of product on the facility for pick-up by authorized drivers at any hour of the day or night provided that proper notice is given to the Contractor and the Carrier has released these trailers for delivery.

(9) Separate gates and a truck marshaling area for Ecuadorian Line trucks will be provided. Howland Hook will provide effective and attractive signage around and on the facility to assist truck drivers in locating the Carrier's warehouse as well as to associate the "Bonita Brand" with a first-class distribution facility.

(10) Howland Hook will provide up to 1,000 square feet of office space (including utilities) at no charge. Additional office space can be provided at a rate of $15.00 per square foot per year, including utilities.

(11) Howland Hook will also provide two dedicated supervisors to Ecuadorian Line on vessel days and one dedicated supervisor on non-vessel days at no additional charge.

(12) If Carrier shall have reason to be dissatisfied with the conduct of the supervisors, Contractor shall, on receiving particulars of the complaint, investigate the matter and, if necessary, appoint new supervisors.

(13) Normal and customary cargo recoopering is included in the base rate. "Normal and Customary" cargo repair will be defined as repair of all damage concurrent with the discharge of the vessels, not to exceed 1.5% of the total cargo on the vessel. This will include restocking cargo on the original pallet and in its original box. All extra labor charges, whether for cargo repair in excess of "normal and customary" recoopering or any other activity, will be approved in advance by the Carrier's representative.





**TERMINAL AGREEMENT; HHCTI & ECUADORIAN April 29, 1997   Page 6**

### 2.6  LIAISON

(1) Contractor shall provide daily reports of loading and discharging, equipment interchanges and the balance of loaded and empty containers in the terminal.

(2) Contractor shall coordinate with representatives and agents of Carrier to expedite and trace containers in the terminal as necessary for pick-up and delivery, or at the request of the Carrier.

(3) Liaison with U.S. Customs, other government officials or agencies, and with agents, employees, brokers, forwarders, truckers or customers of Carrier.

### 2.7  DOCUMENTATION

The Contractor shall prepare and provide in a form mutually agreeable to the Carrier and the Contractor, the following documentation:

(1) Vessel port entry numerical container list

(2) Undelivered container list, expiration of free time

(3) Dock receipts, if produced

(4) Outbound container load plan

(5) Outbound vessel stowage plan

(6) Vessel port exit numerical container list

(7) Outbound dangerous cargo list

(8) Daily container inventory report

(9) Daily gate in and gate out records, and list of damages

(10) Weekly over the road chassis report

(11) Daily gate activity report showing containers and chassis entering and leaving the terminal.



**TERMINAL AGREEMENT; HHCTI & ECUADORIAN** April <u>29</u>, 1997    **Page 7**

(12) Tally sheets for stuffing and stripping, indicating percentage of space utilization.

(13) List of undelivered LCL cargo, expiration of free time

In addition, 30 days after the discharge of the vessel, the Contractor will provide:

(1) Delivery order

(2) Delivery book

(3) Delivery tallies

(4) Stripping tallies

(5) Inbound missing seal report

(6) OS&D report

## SECTION III. CARRIER'S OBLIGATIONS

(1) Carrier shall give Contractor advance notice of vessel's arrival at the terminal. Labor gangs shall be ordered by the Contractor in advance of the vessel's arrival at the terminal, in accordance with Carrier's instructions and the prevailing local ILA rules and subject to the provisions of Section VI of this agreement.

(2) The Carrier shall provide to the Contractor in a timely fashion, all necessary information and instructions covering vessel loading, discharge, stowage, conditions of containers, or cargo requiring special handling and marking, routing, manifests, including container stripping plan showing weight and measurement, and billing instructions, to allow Contractor to provide efficient and economical service.

(3) Any overtime requirements outside the straight-time working hours shall be given in writing by the Carrier's representative.





(4) Carrier shall compensate the Contractor in accordance with Exhibit A attached hereto.

(5) Carrier shall require each of its vessels, upon arrival at the berth, to be prepared for discharging and loading without unnecessary delay.

(6) Carrier shall provide dock receipts or any other papers or information required for the completion of documentation for receiving, delivery, loading and discharging.

(7) Once all cargo discharge and loading of outbound cargo has been completed, Carrier shall remove its vessel from the berth upon request if vessel is not being worked, within two hours of completion, if the berth is required for another vessel.

(8) All containers must be in good condition, with proper markings and in compliance with applicable safety standards.

(9) Carrier shall supply all special cooper supplies and all special materials required for the lashing or securing of cargo.

(10) Carrier shall provide containers of sufficient strength to permit the use of forklift trucks inside the containers in connection with the stripping and stuffing operation at the Container Freight Station.

(11) Carrier shall be responsible for the cost of supplying any heavy-lift equipment required to handle containers or cargo weighing in excess of the 45 ton declared capacity of Contractor's container cranes, or the cost of supplying equipment to receive or deliver cargo which exceeds the capability of Contractor's yard equipment.

(12) The rates quoted are predicated on a pallet friendly vessel which allows for the use of four electric fork lift trucks in each hatch and ship's cranes or derrick with minimum of eight metric ton lifting capacity. At least one-half of the hatch space is to be pre-slung. Contractor shall be entitled to bill for detention the time differential resulting from less than the entire hatch square pre-slung.

(13) In the event that Carrier must charter vessels with less than eight ton gear, Contractor will allow the Carrier three ships per year with gear down to five metric ton capacity at our normal rates. Beyond these three ships, or for ships with gear





**HOWLAND ▮▮▮ HOOK**

TERMINAL AGREEMENT; HHCTI & ECUADORIAN  April 29, 1997  **Page 9**

under five ton capacity, Contractor will receive a rate
differential which will compensate them for the resultant loss in
productivity. The rate differential will be based on crane
lifting capacity.

## SECTION IV. EXTRA LABOR

The Contractor will perform the following extra labor
services at the billing rates set forth in Exhibit A, when
requested by a duly authorized representative of the Carrier. If
these services require the use of Contractor's mechanical
equipment, then Carrier will pay for such equipment at the rates
specified in Exhibit A.

(1) Cleaning of ship's holds, deck, inside of containers
and/or removal of excess debris resulting from such work.

(2) Loading or discharging ship's stores, material,
equipment or refuse.

(3) Loading and/or discharging damaged containers which
cannot be handled by the normal operation of the gantry cranes,
unless such damage is the responsibility of Contractor.

(4) Rigging and/or unrigging ship's gear.

(5) Attachment of water supply to vessel during overtime
hours.

(6) Stuffing or stripping of boats, project or miscellaneous
cargo into or out of containers, flatracks, etc.

(7) If the condition or stowage of containers or packages is
in other than customary good order, thereby delaying prompt
handling, the extra time required to effect handling of such
cargo or containers will be billed at extra labor rates plus the
cost of equipment.

(8) Whenever the Contractor shall be called on to re-handle
or shift containers or cargo in the warehouse, for reasons not
the fault of the Contractor, the time required will be charged at
extra labor.

(9) Loads in containers which are oversized, requiring the
use of special equipment to load or discharge the vessel, and the





TERMINAL AGREEMENT;  HHCTI & ECUADORIAN April <sup>29</sup>, 1997 Page 10

loading or discharging of cargo or equipment which is not
containerized and which does not have a specific rate set forth
in Exhibit A, will be charged at extra labor plus the cost of
equipment pursuant to Exhibit A, for the time required to prepare
the lift, perform the lift, and unrig the equipment.

### SECTION V. PENALTY WAGES

     Differential penalty wages as provided for pursuant to
applicable collective bargaining agreements are not included in
any of the rates set forth in Exhibit A. Whenever such
differential penalty wages are required to be paid, the Carrier
shall pay the Contractor in addition to all other charges, such
differential, plus the related payroll and insurance costs.

### SECTION VI. DETENTIONS

     (1) When labor has been hired to perform work for the
Carrier in accordance with this agreement, and is unable to work
by reason of causes beyond the Contractor's control, or when
labor which is hired to perform work for the Carrier on any day
must be paid for a minimum number of hours because of the
provisions of applicable collective bargaining agreements, all
idle time will be charged to the Carrier at the detention rates
set forth in Exhibit A.

     (2) Should any delay be encountered in the discharging or
loading of vessels through no fault of the Contractor, such
detention shall be for the account of the Carrier. The entire
duration of all detentions lasting fifteen (15) minutes or more
will be charged at the detention rate. There will be no charge
for interruptions of less than fifteen (15) minutes duration,
except that recurring interruptions resulting from the same
causes shall be charged as one cumulative detention.

### SECTION VII. DISTRESS CARGO

     When handling cargo damaged by fire, water, oil,, etc., and
where such damage causes distress or obnoxious conditions, or in
all cases where labor is called upon to handle cargo under
distress conditions, the penalty wages as called for and so
defined by the applicable collective bargaining agreements and



**HOWLAND HOOK**

TERMINAL AGREEMENT; HHCTI & ECUADORIAN  April 29 , 1997 Page 11

the NYSA/ILA Board as distress cargo, shall be assessed by the
Contractor to the Carrier, unless the condition is due to the
fault of the Contractor, in addition to the rates called for in
Exhibit A, as well as the cost of gear destroyed as a result of
such distress conditions, and the cost of equipment for the
protection of labor as may be required. Mechanical equipment,
when required, will be charged to the Carrier pursuant to Exhibit
A.

## SECTION VIII. DEMURRAGE

Demurrage will be assessed, billed and collected by the
Contractor for its own account, according to the rates and
conditions specified in the Tariff filed by Carrier.

## SECTION IX. LOADING/UNLOADING SERVICES; INLAND CARRIERS

The Contractor shall provide loading and unloading services
to inland carriers, as specified in Howland Hook Marine Terminal
Tariff No. 1, as amended from time to time. Such services will be
performed at the Container Freight Station during normal working
hours on normal working days and shall bill and collect its
charges for its own account, according to the rates and
conditions set forth in the Tariff.

## SECTION X. PAYMENT

(1) Carrier shall compensate Contractor for the performance
of the services described herein, in accordance with the rates
contained in Exhibit A, and such other supplemental agreements as
may be entered into by the parties.

(2) All payments shall be made in U.S. funds. Invoices are
due within 10 days of the date of receipt of the invoice.
Payments received after 30 days from the date of receipt of the
invoice are subject to a finance charge of 1.5% for each month or
part thereof. If Carrier prepays 80% of the pro-forma invoice
amount prior to vessel arrival, it may take a 1.25% discount.
Contractor to specify on invoice discounted amount to be paid.

(3) All rates set forth in Exhibit A have been arrived at
and are based on rates of pay and working conditions presently in
force under the applicable collective bargaining agreements in
the Port of New York. In the event of any change in the cost of






**TERMINAL AGREEMENT; HHCTI & ECUADORIAN** April <u>29</u>, 1997 **Page 12**

ILA labor resulting from changes in wages, fringe benefits, Waterfront Commission and other assessments, insurance, payroll and similar taxes or ILA working conditions, the rates set forth in Exhibit A will, as a consequence, be increased or decreased proportionately.

For purposes of determining any such increase in ILA labor costs which may become effective from time to time, the cumulative total of such changes since the beginning of the latest agreement to the date of the increase shall be expressed as a percentage, and applied to the labor portion of the rates set forth in Exhibit A.

(4) None of the rates in Exhibit A include NYSA/ILA royalty or tonnage assessments. In the event that Contractor should be required to make or collect such payments, these will be charged to the Carrier and reimbursement shall be made promptly by the Carrier upon presentation of an invoice by Contractor.

## SECTION XI. SAFETY

(1) Carrier shall maintain and offer for inspection, on demand by the Contractor prior to the commencement of cargo operations, the valid cargo gear register and certificates required by Section 1918.12 and any amendments thereto of the Safety and Health Regulations for Longshoring of the Occupational Safety and Health Administration, United States Department of Labor, Code of Federal Regulations, Title 29, Chapter XVII. After Carrier provides such gear register and certificates, the Contractor shall have the sole responsibility for compliance with all applicable provisions of Part 1918 of such Safety and Health Regulations (29 CFR Part 1918), and any amendments thereto, and with any other state or federal safety regulations which may be applicable.

(2) Contractor shall perform all of its work as an independent contractor and shall have the sole responsibility for the manner or methods used in performing the stevedoring operations and shall have complete control over all areas of the vessel and over all gear and equipment (whether supplied by Carrier, Contractor, or others) reasonably needed by it to properly perform the stevedoring operations.





(3) Prior to commencing, during and until the completion of its work, Contractor shall have the sole responsibility for inspecting and determining the safety of all work areas and of all gear and equipment (whether supplied by Carrier, Contractor, or others) which will be utilized in its operations and Contractor shall not commence or shall immediately terminate its operations in the area involved until it has corrected or caused to be corrected any dangerous conditions and/or any unsafe gear and equipment which are known or should have been known to Contractor to exist or come into being during Contractor's operations.

(4) Contractor shall have the sole responsibility for inspecting cargo previously stowed aboard the vessel or on the dock in those areas where its operations are to be performed and for inspecting cargo to be loaded on or discharged from the vessel and Contractor shall correct or cause to be corrected any dangerous conditions which are known or should have been known to Contractor to exist in the cargo or its stowage before proceeding with its operations, but only if said dangerous condition is visible to inspection.

(5) Contractor shall immediately notify the vessel's officer on duty of any property damaged and of any illness, injury or death of any person which occurs during its operations, and shall cooperate fully with the Carrier in developing full and complete information about the facts and circumstances of the occurrence and the nature and extent of the damages or injuries which resulted therefrom.

(6) It is hereby understood that Contractor shall be an independent contractor and not an agent or employee of Carrier and all employees or laborers employed in the performance of the services under this Agreement shall be employees of Contractor, or its subcontractors, at all times and not of Carrier.

(7) Any idle time incurred by the Contractor through no fault of its own, as a result of any violations of any safety regulations due to conditions existing on board vessels of the Carrier not caused by the act or neglect of Contractor or its agents shall be charged for by the Contractor at the detention rates provided in Exhibit A.

(8) Carrier accepts responsibility for the accuracy  of marked capacity, tare, gross, and net weights appearing on or declared for all containers offered to Contractor for loading and





**TERMINAL AGREEMENT; HHCTI & ECUADORIAN April 29, 1997 Page 14**

discharging to and from vessels with Contractor's equipment.
Carrier agrees that the cost of supplying any heavy lift
equipment required to hoist cargo or containers with weights
exceeding the 45 ton declared capacity of Contractor's cranes, or
the cost of supplying equipment to move or support cargo beyond
the capability of Contractor's equipment shall be for the account
of Carrier.

## SECTION XII. INDEMNITY

(1) The Carrier warrants and agrees to indemnify the
Contractor and hold it harmless against any loss, damage, injury,
death, or delay caused by breakdown, failure or fault in vessel's
gear, or by failure, fault or negligence of vessel's officers or
crew, or by any unseaworthiness of the vessel, or failure by
Carrier to perform any obligation required to be performed by it,
unless, in each case, caused by the act or neglect of Contractor,
its employees or its agents, or a breach of this Agreement by
Contractor.

(2) The Contractor agrees to indemnify and hold harmless the
Carrier, the shipowner, the Carrier's vessels, and the operators,
charterers, and agents of such vessels from any and all loss,
liability, claims and actions (and all expenses connected
herewith, including reasonable attorney's fees and costs) for
injury or death to any person or for damage to or loss of
property (including, but not limited to cargo, containers, ship's
equipment, and shore cranes) to be extent caused by the
negligence or fault of the Contractor, its employees, its agents,
its contractors, or its equipment.

(3) Contractor shall not in any event be liable to Carrier
for loss, damage, injury, death or delay caused by acts of God or
the public enemy, strikes, riots or civil commotion, labor
disturbances of any kind, or for any conditions or occurrences
beyond the control and without the fault or negligence of
Contractor. Contractor agrees to exercise such control as
necessary and possible to provide prompt and accurate dispatch of
cargo and containers.

(4) The Carrier agrees to retain in its bills of lading
provision which makes available to the Contractor all rights,
protections and limitations of liability available to Carrier
under the law.





**TERMINAL AGREEMENT; HHCTI & ECUADORIAN April <u>29</u>, 1997  Page 15**

(5) When Carrier accepts cargo on an "ad valorem" basis, the Contractor shall not be responsible for increased liability unless the Carrier gives the Contractor prior written notice in sufficient time for the Contractor to arrange for special handling and/or supervision, and the extra charges therefore shall be agreed upon between the parties. Such notice shall include a description of the quantity, nature and value of the goods so shipped.

## SECTION XIII. DAMAGE AND LOSS

(1) When damage occurs to the vessel or its equipment, the ship's officer or Carrier's authorized representative shall bring the specific damage or loss to the attention of Contractor as soon as practical.

(2) Contractor shall be liable for damage to or loss of cargo caused by any act or neglect of Contractor, its employees or its agents, however Contractor's liability to Carrier or cargo interests shall be limited to the limitations in the ship's bill of lading. The Contractor shall promptly report in writing any damage to containers and chassis caused by Contractor's employees. Contractor shall put the vessel on written notice of any substantial container damage present prior to discharge.

(3) In no event shall Contractor be liable to Carrier or any third party for "special" or "consequential" damages related to damage to or loss of cargo.

(4) Contractor will accept responsibility for reasonable care and control of cargo, containers and equipment while in the terminal, but assumes no liability for the delivery and receipt of cargo, containers or the contents thereof, in accordance with the instructions of Carrier or its representative.

(5) Contractor shall not be liable for the condition of non-containerized perishable cargo or for any damage to said cargo resulting from temperature changes or conditions, or any claims resulting therefrom unless caused by the act or neglect of Contractor, its employees or its agents or any breach of this Agreement by Contractor.

(6) Contractor shall not be liable for the maintenance of temperatures or the condition of containerized cargo while said





cargo is under refrigeration, unless caused by the act or neglect of Contractor, its employees or its agents or any breach of this Agreement by Contractor, or when deficiencies are not reported promptly.

### SECTION XIV. WORKERS' COMPENSATION

Contractor shall maintain in effect at all times during the term of this agreement workers' compensation coverage for protection of its employees, in accordance with the requirements of the United States Longshoremen and Harbor Workers Act.

### SECTION XV. INSURANCE

(1) Without in any way relieving Contractor from the obligations provided in Articles XI through XIV hereof, Contractor agrees to carry, at its sole cost and expense, insurance that shall be applicable to all work and operations hereunder, insuring as follows:

(i) Standard Workers' Compensation Insurance and employer's liability insurance as required under State and Federal law;

(ii) Employers Liability Insurance in the form customarily available, subject to minimum of $500,000 with respect to any one occurrence or series of occurrences;

(iii) Comprehensive General Liability Insurance for bodily injuries and/or death in the total amount of at least $10,000,000 for death and/or bodily injury of one or more persons in a single accident or series of accidents;

(iv) Property Damage Liability Insurance in the total amount of $10,000,000 as protection against loss or injury to property in a single accident or series of accidents resulting from the negligence of the Contractor or its agents; and

(v) Excess Public Liability and Property Damage Liability Insurance covering all operations in a combined single limit of $5,000,000 in addition to the primary policies.

(2) Carrier shall be a named additional assured on all liability insurance. Contractor shall furnish Carrier with certificates of insurance evidencing such coverage. Carrier shall be given thirty (30) days written notice of cancellation of any policy.





305

TERMINAL AGREEMENT; HHCTI & ECUADORIAN April <u>29</u>, 1997  Page 17

(3) It is understood and acknowledged that the cost of the insurance required above is included in the per box rate set forth in Exhibit A.

## SECTION XVI. OVERTIME HOURS

(1) When authorized in writing by Carrier, Contractor shall provide stevedoring services and terminal services during "overtime hours" as defined in the then currently effective NYSA/ILA collective bargaining agreement.

(2) Carrier agrees to compensate Contractor for the additional cost incurred during overtime hours in accordance with the rates set forth in Exhibit A. It is understood and agreed that the rates for vessel stevedoring include the hours of 0700 to 0800 treated as straight time, for one morning of vessel operations only, at Carrier's option. Carrier shall order accordingly.

(3) The cost of overtime hours of watching personnel will be charged to the Carrier when ship and/or cargo are being worked during overtime, and at no other time, unless additional watching is requested and authorized by the Carrier, in which case all cost of additional watching personnel shall be payable by Carrier.

## SECTION XVII. APPLICABLE LAW

It is agreed by the parties to this agreement that the laws of the State of New York shall be applicable to and govern all claims, actions or disputes that may arise under this agreement.

All disputes arising out of this Agreement shall be arbitrated in New York, New York. One arbitrator shall be appointed by each of the parties hereto and a third by the two so chosen. Their decision, or that of any two of them, shall be final and, for the purpose of enforcing any award, this Agreement may be made a rule of the court. The arbitrators shall be commercial people, conversant with shipping matters. The arbitration shall be conducted in accordance with the rules of the Society of Maritime Arbitrators Inc. or the American Arbitration Association, as selected by the party commencing the arbitration.





**HOWLAND HOOK**

**TERMINAL AGREEMENT; HHCTI & ECUADORIAN April 29, 1997  Page 18**

For disputes where the total amount claimed by either party does not exceed US$100,000, the arbitration shall be conducted in accordance with the Shortened Arbitration Procedure of the Society of Maritime Arbitrators Inc. or the American Arbitration Association, as selected by the party commencing the arbitration.

In connection with the enforcement of this clause and any arbitration award, Carrier hereby agrees to submit to the jurisdiction of the Courts of the State of New York including the United States District Courts located in New York, and appoints Ecuadorian Line Inc., a Delaware corporation with offices in New York, as its agent for the service of legal process in New York. Nothing contained herein shall be construed as depriving Contractor of any other rights it may have against Carrier or its vessels at law, in admiralty or in equity as a result of any breach by Carrier of its obligations hereunder.

**SECTION XVIII. FORCE MAJEURE**

Except as otherwise agreed to by the parties hereto, no liability shall attach to the Contractor or the Carrier if the terms of this agreement cannot be performed due to act of God, war, government, fire, explosion, earthquake, terrorist acts, civil commotion, strikes or other labor difficulties, except that Carrier shall pay its reasonable share of the additional cost to Contractor of any services and/or facilities provided to the Carrier by the Contractor during any such period of forced inactivity, for any vessels of the Carrier in berth, and the cost of watching personnel and such other employees as may be required to accommodate and protect the vessels and cargoes of the Carrier.

**SECTION XIX. TERM**

(1) The initial term of this Agreement shall be eight (8) years, commencing on the Effective Date (as defined below). Carrier shall have the option to renew this Agreement for an additional term of five (5) years by written notice to Contractor not less than ninety (90) days prior to expiration of the initial eight year term.

(2) This Agreement shall not be terminated by either party except:





a) for cause; cause being defined as a material breach of this
   Agreement by a party, including but not limited to a failure
   of either party to perform its obligations under this
   Agreement in accordance with a reasonable standard of
   commercially accepted practice.

b) if the parties fail to agree prior to May 31, 2001, on the
   rates to be applicable under this Agreement for the period
   commencing October 1, 2001.

   (3) Termination of this Agreement pursuant to paragraph 2
above shall be upon 90 days written notice. Upon termination of
this Agreement by either party, neither party hereto shall have
any further rights or obligations hereunder, except such rights
and obligations as accrued prior to the effective date of
termination. If notice of termination shall be served pursuant to
paragraph 2(a) above on the basis of a material breach, the party
in breach shall have 30 days from the date the notice is
received, to cure said breach.

## SECTION XX. CONDITIONS PRECEDENT

   (1) The rights and obligations of Contractor and Carrier
hereunder shall be subject to satisfaction of the following
conditions precedent, any one or more of which may be waived by
Carrier in its sole discretion:

   (i) on or before May 30, 1997, Contractor shall have
provided to Carrier evidence, reasonably satisfactory to Carrier,
that Contractor has obtained the funding required to construct
the 66,400 sq. ft. refrigerated warehouse described in Section
2.5 of this Agreement,

   (ii) on or before November 1, 1997, Contractor shall have
completed and made operational the first chamber of the
refrigerated warehouse, consisting of at least 12,480 sq. ft.,

   (iii) the NYSA-ILA Pension Trust Fund shall have agreed that
cessation of terminal operations at Port Newark, New Jersey and
movement of the Ecuadorian Line terminal to Howland Hook do not
trigger withdrawal liability of Ecuadorian Line, Inc. or any
other affiliate of Carrier under the terms of the pension plan;
and

   (iv) the Port Authority of New York and New Jersey shall
have agreed to release Carrier's affiliate Ecuadorian Line, Inc.





**HOWLAND HOOK**

TERMINAL AGREEMENT; HHCTI & ECUADORIAN April 29, 1997  Page 20

from all of its obligations under the existing lease agreement covering its terminal facility at Port Newark, New Jersey on such terms and conditions as are acceptable to Ecuadorian Line, Inc. in its sole discretion.

## SECTION XXI. EFFECTIVE DATE

This Agreement shall become effective immediately upon satisfaction of the conditions precedent set forth in the previous paragraph. Carrier shall certify in writing to Contractor when such conditions have been satisfied so as to render this Agreement effective.

## SECTION XXII. COMMENCEMENT OF CONSTRUCTION

Construction of the refrigerated facility shall commence immediately upon this Agreement becoming effective, and shall be completed in accordance with the construction schedule attached hereto as Exhibit B. Carrier is not obligated to commence cargo operations at Howland Hook until this Agreement becomes effective.

If the refrigerated warehouse is not completed on or before March 1, 1998, Carrier may terminate this Agreement upon 30 days prior to written notice to Contractor.

## SECTION XXIII. ACCESS TO TERMINAL

The agents, employees, and representatives of the Carrier shall, by arrangement with the Contractor, have access to the terminal on a 24-hour basis in connection with any activities performed by the Contractor on behalf of the Carrier, pursuant to the terms hereof.

Carrier agrees to indemnify and hold Contractor harmless against any loss, expense or liability by reason of any damage, or injury, including death, occurring as a result, direct or indirect, of permission granted by Carrier, its agents, employees or servants, allowing or permitting persons who are not employees, agents or representatives of the Carrier, the vessel, or the vessel's agent, or who are not persons furnishing services to the vessels, to be upon the premises of the Contractor, whether on land or water, unless due to the proven negligence of Contractor.





**TERMINAL AGREEMENT; HHCTI & ECUADORIAN**    April <u>29</u>, 1997    **Page 21**

## SECTION XXIV. OTHER SERVICES

The Contractor shall offer other related services not specifically described herein, and not limited to the following, as requested by the Carrier, and upon such terms and conditions, as may be mutually agreed upon between the parties.

> (1) Lashing and carpentry services for containers and cargo other than on vessels, will be provided at the cost of labor plus 15% and materials.

> (2) Supplying the vessel with water at the Contractor's cost of water.

> (3) Chassis pool suitable to Carrier's requirements.

> (4) Inland control and container utilization.

> (5) EDP services

> (6) House trucking services

## SECTION XXV. RAIL

Contractor represents to Carrier that the restoration of service to Contractor's on-dock rail will be accomplished within approximately 6 months of the date of the execution of the Contract, or within a reasonable time thereafter.

## SECTION XXVI. BRIDGE TOLL REIMBURSEMENT

Contractor will reimburse the Carrier or the shipper, trucker or consignee, as the case may be, for the cost of any and all tolls actually expended on the Port Authority Staten Island Bridges moving cargo or equipment to and from Howland Hook.

## SECTION XXVII. MODIFICATIONS

This Agreement once executed, may only be modified by mutual written consent of the parties.





**TERMINAL AGREEMENT; HHCTI & ECUADORIAN    April 29, 1997  Page 22**

## SECTION XXVIII. WAIVER OF SOVEREIGN IMMUNITY

Carrier hereby acknowledges that its activities are commercial in nature, and that its assets, including vessels and related equipment, are commercial property. Any defense of sovereign immunity which might exist under applicable law for the Carrier, with respect to this agreement or any related matters, is expressly and irrevocably waived.

## SECTION XXIX. ELECTRONIC DATA INTERCHANGE

Contractor and Carrier commit themselves to facilitate E.D.I. connections between participating parties so they can interchange electronic data commencing with the very first vessel.

Contractor agrees that U.S. Customs A.M.S. system and BAPLIE or EDIFACT systems designed to receive and send stowage and bay plans via GEIS and/or Internet, or other systems acceptable to Carrier will be implemented as soon as possible.

## SECTION XXX. HOWLAND HOOK TERMINAL TARIFF

It is acknowledged that Contractor has issued its own Terminal Tariff, known as Howland Hook Marine Terminal Tariff No. 1, dated September 5, 1996 (the "Tariff"). It is expressly agreed by Contractor that this Terminal Operating and Stevedore Services Agreement, and any conference agreements or service contracts entered into by the Carrier, shall supersede the Tariff.

## SECTION XXXI. MAINTENANCE AND LASHING

Carrier agrees to engage Contractor for all maintenance and repair to be performed at the terminal upon Carrier's containers, chassis, reefers, generator sets, etc., pursuant to terms, conditions and rates to be mutually agreed upon. This service shall be performed in the specialized segregated maintenance facility within the terminal. Contractor shall not use third party subcontractors for equipment maintenance or lashing services. Carrier agrees to engage Contractor for lashing and unlashing services on the vessel, pursuant to the rates set forth in Exhibit A, if Carrier requires such lashing services.





**TERMINAL AGREEMENT; HHCTI & ECUADORIAN   April <u>29</u>, 1997   Page 23**

### SECTION XXXII. CONFIDENTALITY

　　Contractor/Carrier shall not disclose any information to third parties about Carrier's/Contractor's activities, including but not limited to customer lists, manifests, commodity details and other confidential data, other than when required to do so by law, including this Agreement, or concerning Carrier's/Contractor's business (excluding cargo details required for wharfage calculation), and shall not use such information competitively against the other party hereto.

### SECTION XXXIII.NOTICES

　　All notices required under this agreement shall be sent to the addresses set forth below by registered mail, and shall be effective upon receipt. Unless subsequently changed by notice in writing Contractor's address shall be:

　　**300 Western Avenue, Staten Island, New York 10303**

Carrier's address shall be:

　　**c/o Ecuadorian Line, Inc.**
　　**6161 Blue Lagoon Drive, Suite 6250**
　　**Miami, Florida 33126-2046**

IN WITNESS WHEREOF, the parties have caused this agreement to be executed by their duly authorized representatives on the day and year first above written, in two originals.

**SOUTH PACIFIC SHIPPING CO. LTD.**
　　**(d/b/a ECUADORIAN LINE)**
　　　　**(Carrier)**

By: _____

Title: Vice-President

Date: April 29, 1997

**HOWLAND HOOK CONTAINER**
**TERMINAL, INC.**
**(Contractor)**

By: _____

Title: _President_

Date: _25th April 1997_