John R. Keough, III (JK 6013)
John R. Foster (JF 3635)
Cody D. Constable (CC 6659)
**WAESCHE, SHEINBAUM & O'REGAN, P.C.**
Attorneys for Plaintiffs
SOUTH PACIFIC SHIPPING CO. LTD.,
and PACIFIC FRUIT INC.
111 Broadway, 4th Floor
New York, New York 10006
(212) 227-3550


UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK                                    **ECF CASE**
-------------------------------------------------------------------X
SOUTH   PACIFIC   SHIPPING   CO.   LTD.   (d/b/a
ECUADORIAN LINE) and PACIFIC FRUIT INC.,            07 Civ. 6317 (GEL)(KNF)

                                        Plaintiffs,

                                                            **DECLARATION OF**
            -against-                                       **KEVIN HORVATH**

NEW YORK CONTAINER TERMINAL, INC.,

                                        Defendant.
-------------------------------------------------------------------X

KEVIN HORVATH declares as follows:

        1.      I am Vice President of Ecuadorian Line, Inc. ("Ecuadorian Line"), an authorized

representative in the United States for plaintiff South Pacific Shipping Co. Ltd. ("South

Pacific").  I make this Declaration based on my personal knowledge and based on the documents

maintained by me at Ecuadorian Line.

        2.      I respectfully submit this Declaration in support of plaintiffs' application on an

urgent basis for a temporary restraining order and preliminary injunction enjoining defendant,

New York Container Terminal, Inc. ("NYCT"), from failing to perform its duties in accordance

with the Terminal Operating, Stevedoring and CFS ["Container Freight Station"] Service

Agreement (the "Stevedoring Contract"), dated April 29, 1997, as amended by the Confidential Rate Schedule for Ecuadorian Line, dated October 1, 2005 and signed in December 2006.

3.      South Pacific operates vessels engaged in the ocean carriage of perishable and other cargoes to various ports in the world, including the port of New York, and carries perishable cargoes for Pacific Fruit to the port of New York in a regular weekly service.

4.      On or about April 29, 1997, South Pacific (d/b/a Ecuadorian Line) ("Ecuadorian Line"), entered into the Stevedoring Contract with Howland Hook Container Terminal, Inc. ("Howland Hook"), a predecessor entity to New York Container Terminal, Inc. ("NYCT"), defendant in this action.  I personally participated in the negotiation of this agreement.  The Stevedoring Contract is attached hereto as Exhibit 1.

5.      The Stevedoring Contract provided, among other things, that Howland Hook would provide terminal operating and stevedoring services to South Pacific. The agreed services include the removal of cargoes of perishable fruit from South Pacific's vessels which are stowed in containers on deck and on pallets in the vessel's holds below deck.

6.      On or about December 5, 2006, South Pacific agreed to renew the Stevedoring Contract for an additional term of five (5) years by signing the Confidential Rate Schedule dated October 1, 2005.  On December 26, 2006, NYCT agreed to the renewal terms by executing the same Confidential Rate Schedule, a copy of which is attached hereto as Exhibit 2.  The 2005 Rate Schedule provides that NYCT would continue performing under the Stevedoring Contract through at least 2010.  I also personally participated in negotiating the renewal and the Confidential Rate Schedule.

7.      At the outset of the agreement in 1997, South Pacific used mainly Ocean Class vessels to perform the service to New York: These three vessels are named the M/V ARCTIC OCEAN, the M/V ATLANTIC OCEAN and the M/V INDIAN OCEAN.

8.      After about 1999, South Pacific began using mainly Island Class vessels in the service to New York: These five vessels are named the M/V ALBEMARLE ISLAND, the M/V BARRINGTON ISLAND, the M/V CHARLES ISLAND, the M/V DUNCAN ISLAND and the M/V HOOD ISLAND.

9.      Beginning in about January 2007, South Pacific again returned to using mainly Ocean Class vessels in the New York service, but also uses Island Class vessels from time to time.

10.     The Stevedoring Contract does not limit South Pacific's use of either an Island Class vessel or an Ocean Class vessel.

11.     Under the Stevedoring Contract, NYCT guarantees to provide South Pacific's vessels a berth and related stevedoring services at NYCT's terminal at Staten Island, New York, on each Wednesday, Thursday and Friday.  These are the days required for discharge of Pacific Fruit's fruit cargo based on the schedule for harvesting and loading the bananas and other fruit in Ecuador and the duration of the voyage to New York.

12.     By letter to Carlos Aguirre dated March 30, 2007, James J. Devine, the President and CEO of NYCT, stated that NYCT would require South Pacific to pay an additional $80,000 per month, and that NYCT's "billing would be retroactive to the first of the year."

13.     The Stevedoring Contract does not state any right of NYCT to demand payment of an additional $80,000 per month.

14.     The parties to the Stevedoring Contract never mutually consented to modify the contract to allow NYCT to charge South Pacific an additional $80,000 per month.

15.     The Confidential Rate Schedule states that the stevedoring rates for palletized bananas and fresh fruit "include straight time labor costs from the hold of the vessel through to the truck.  This rate includes all costs associated with unloading perishable cargoes from the vessel to the warehouse, storage in a dedicated refrigerated warehouse facility, and the loading of the product onto your customer's trucks." (Exhibit 2, Section I, ¶ 2)

16.     On or about May 23, 2007, NYCT informed plaintiffs that unless South Pacific immediately paid NYCT $240,000 (for three allegedly due monthly charges of $80,000 each), NYCT would stop removing the fresh bananas and other perishable cargoes from the M/V INDIAN OCEAN, a South Pacific vessel then docked at NYCT's terminal at the port of New York and in the process of unloading.

17.     South Pacific carries Pacific Fruit's bananas and other perishable cargoes each week to the port of New York pursuant to contracts of ocean carriage reflected by ocean bills of lading on Ecuadorian Line's form.  (A copy of a sample bill of lading for such cargo is attached hereto as Exhibit 3).  The bills of lading obligate South Pacific to carry the perishable cargoes to and discharge them at the port of New York.

18.     No other port or terminal in the New York area can unload and handle South Pacific's vessels or the perishable cargoes on short notice.

19.     Facing the loss of perishable cargo and not having any other means of unloading the perishable cargoes, South Pacific (through Ecuadorian Line) paid the demanded sum of $240,000 under protest to NYCT to prevent imminent harm to the cargo on May 23, 2007.  After receiving the payment, NYCT discharged the INDIAN OCEAN's cargo.

20.     On May 22, 2007, the President of Pacific Fruit, Carlos A. Aguirre, wrote to NYCT's Mr. Devine, and explained his reasons for disagreeing with NYCT's unilateral demand for an additional $80,000 per month and suggested the parties discuss the matter. (A copy of the letter from Carlos A. Aguirre dated May 22, 2007 is attached hereto as Exhibit 4).

21.     Mr. Aguirre explained that the contract allowed the use of both Island and Ocean Class vessels without additional charge, and that NYCT's argument that it could pass on an additional charge was unfounded.

22.     Representatives of South Pacific and Pacific Fruit met with NYCT representatives on June 7, 2007.  NYCT refused to change its demand.

23.     South Pacific is not contractually obligated to pay, and will not pay, NYCT's demand of an additional $80,000 per month.  NYCT is not entitled to such a payment under the Stevedoring Contract.

24.     By email to Mr. Aguirre dated Friday, June 8, 2007 (a copy of which is attached hereto as Exhibit 5), Mr. Devine notified Mr. Aguirre that NYCT would not accept any South Pacific vessels on the guaranteed days, but that the vessels would be allowed to call only on Tuesdays and Wednesdays.

25.     He alleged that there was no "current contract to service the Ocean Class Vessels that you have presented to us," and stated in relevant part as follows:

- "NYCT is proceeding with the understanding that we do not have a current contract to service the Ocean Class Vessels that you have presented to us.  Ecuadorian's decision to bring these vessels to the terminal without our permission has resulted in a material change to this terminal and as such your actions abrogated the contract which was established less than two years ago.

- In that this vessel is effectively a break bulk operation, we do not have the manpower to work it during the same time slot that you worked with the Island Class Vessels.  The only timeslot that is available at this terminal to work these break bulk vessels is on a

Tuesday/Wednesday proforma. If Ecuadorian can make the necessary arrangements to present these vessels to us on Tuesday/Wednesday we would be very pleased to work them at that time and will establish a contract to reflect the new operation.

- In the event that we do establish a Tuesday/Wednesday proforma for your vessel, the terminal will make its best effort to work the vessel that is off proforma consistent with the terminal's other work requirements.

- Once again, if Ecuadorian can bring the vessel in on Tuesday/Wednesday, the terminal agrees to work these vessels on this newly established proforma for a period of four months under the rates in the old abrogated contract. We will do this out of good faith in order to understand what the impact is in terms of manning, equipment requirements, productivity and efficiency variables. Once we have this experience we will come up with a new proposed rate and sit and negotiate a contract going forward. We will not seek to retroactively bill during the time we evaluated the new proforma."

26.     By letter to Mr. Aguirre dated June 19, 2007, Mr. Devine attempted to explain his alleged reasons for the new "monthly surcharge."

27.     On behalf of Ecuadorian Line, Inc., as representative for South Pacific, I notified NYCT by email to Mr. Devine dated June 25, 2007 (a copy of which is attached hereto as Exhibit 6), as follows:

"We reply to your email sent to Carlos Aguirre on Friday, June 8, at 5:04 pm. Your refusal to honor our contract is unacceptable and your proposal that we release NYCT from its existing contractual obligations is rejected. Your message makes a number of incorrect assertions. We address some of them below to set the record straight.

First, we cannot imagine where you get the idea that you do not have a contract for the Ocean class vessels, or for any other vessels we operate. As you know, and as we have reminded you several times recently, the contract expressly obligates you to work these vessels. We operated these same Ocean class vessels at your terminal at the outset of the contract.

Second, you also incorrectly contend that we abrogated the contract. You are wrong in stating that we did not obtain your permission to bring them to the terminal. You gave permission by agreeing to the contract, most recently in December 2006.

Nor are the Ocean class vessels effectively a breakbulk operation as you allege.

You contractually guaranteed us a berth and terminal services for Wednesday, Thursday and Friday of each week. Now you tell us you will disregard that guarantee. We do not agree to

change the contractual dates. We must hold you to your word and insist that you perform your obligations in accordance with our valid and binding contract.

Kevin Horvath
Ecuadorian Line"

28.    Mr. Devine replied to me by email about 8 minutes later as follows ( a copy of which is attached hereto as Exhibit 7):

"Kevin, it is unfortunate but we are in complete disagreement. Effective the first week of August we are only able to work your vessels on a Tue/Wed proforma. If you are unable or unwilling to comply with this, we will be unable enter into a contract to work them.

Would appreciate hearing from you if plan on leaving so that we can make the necessary arrangements. Jim"

29.    As of this Wednesday, July 11th, South Pacific will have two (2) ships on the water sailing to NYCT's terminal in the port of New York carrying fresh bananas and other perishable cargo for delivery to Pacific Fruit.

30.    NYCT operates the only marine terminal in the New York area at which South Pacific can deliver and Pacific Fruit can import its Perishable Cargoes.

31.    The cargo is intended for sale to Pacific Fruit's customers in the New York area and elsewhere in the Northeast.  In accordance with U.S. import regulations, plaintiffs declared the cargo for security clearance at NYCT's terminal 24 hours prior to loading in Ecuador as required by the U.S. Department of Homeland Security.

32.    By email to Mr. Aguirre dated July 6, 2007, Mr. Devine notified Mr. Aguirre that the two outstanding invoices for the "additional handling charges" for April and May "need to be paid prior to ordering labor for next week's vessel to avoid any difficulties."

33.    The vessel schedule is as follows:

(a)      The M/V DUNCAN ISLAND has on board approximately 206,378 boxes of bananas and other perishable cargoes for discharge at New York.  The vessel sailed from Ecuador on July 5 and is due to arrive on the scheduled call this Thursday, July 12.

(b)      The M/V ATLANTIC OCEAN is loading in Ecuador this week, is due to sail on July 11 for New York carrying on board about 200,000 boxes of bananas and other perishable cargoes for discharge at New York, where the vessel is due to arrive on the regular scheduled call next Thursday, July 18.

(c)      The M/V ARCTIC OCEAN is scheduled to load similar cargo in about the same quantity and to sail from Ecuador on Thursday, July 19, and arrive at New York on Thursday, July 26.

(d)      The M/V HOOD ISLAND is scheduled to load a similar quantity of such cargo, to sail from Ecuador on Friday, July 27, and to arrive at New York on Friday, August 3.

34.     If NYCT fails to perform its duties under the Stevedoring Contract, the subject perishable cargoes of the DUNCAN ISLAND and the other scheduled vessels will not be unloaded on schedule and will remain on board, and unless unloaded will ripen, rot, and become unmarketable and unfit for human consumption.

35.     NYCT's refusal to discharge the perishable cargoes has created a likelihood of imminent loss of or damage to Pacific Fruit's cargoes and will interfere with South Pacific's contracts of carriage.  NYCT's refusal will prevent South Pacific from delivering the cargoes on board as obligated under its contracts of carriage and thus will cause a breach of such contracts with Pacific Fruit and other cargo owners.

I declare under penalty of perjury under the laws of the United States of America that the above declaration is true and correct.

Executed this 10th day of July, 2007, at Miami, Florida.

KEVIN HORVATH