Mark M. Jaffe (MJ-4855)
Elizabeth A. McCoy (EAM-8448)
Gordon S. Arnott (GSA-8612)
**HILL, BETTS & NASH LLP**
*Attorneys for Defendant*
NEW YORK CONTAINER TERMINAL, INC.
One World Financial Center
200 Liberty Street, 26th Floor
New York, NY 10281
(212) 839-7000

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------x
SOUTH PACIFIC SHIPPING CO. LTD
(d/b/a Ecuadorian Line) and PACIFIC FRUIT, INC.

                                                                    Case No. 07 Civ. 06317 (GEL)

                    Plaintiffs,

        - against -                                           **DECLARATION OF**
                                                                    **JAMES J. DEVINE**
NEW YORK CONTAINER TERMINAL, INC.

                    Defendant.
----------------------------------------------------------x

        James J. Devine declares as follows:

        I am the President and Chief Executive Officer of defendant NEW YORK

CONTAINER TERMINAL, INC. ("NYCT"). I submit this Declaration in opposition to

the application of plaintiffs SOUTH PACIFIC SHIPPING CO. LTD (d/b/a Ecuadorian

Line) ("South Pacific") and PACIFIC FRUIT, INC. ("Pacific Fruit") for a preliminary

injunction requiring NYCT to provide terminal and stevedoring services at times, service

and performance levels and at a cost structure which (a) are beyond contemplation of the

governing stevedoring contract between NYCT and South Pacific; and (b) exceed the

capacity of the refrigerated palletized facility warehouse which NYCT provides to South

Pacific pursuant to the stevedoring contract. In addition, this level of work exceeds the
Terminal's ability to provide the necessary labor on a sustained basis.

## CORPORATE AND PERSONAL BACKGROUND

1.      NYCT is the successor to Howland Hook Container Terminal, Inc.
("HHCTI") which, as lessee from The Port Authority of New York and New Jersey (the
"Port Authority"), reopened and refurbished the Howland Hook Container Terminal (the
"Terminal") beginning at the end of 1995.

2.      The Terminal comprises approximately 187 acres on Staten Island, New
York and is by far the largest container terminal in the State and City of New York. It is
also the largest commercial employer on Staten Island.

3.      I was recruited to my present capacity and assumed responsibility for
management of the Terminal on October 1, 2001.

4.      In January 2005, NYCT was formed as the successor lessee of HHCTI and
took over the operation and management of the Terminal which was renamed "New York
Container Terminal."

5.      Prior to assuming my current responsibilities, I was Sr. Vice President for
Operations for CMA-CGM, a French container line, and my previous experience
involved 27 years with Sea-Land Service, Inc. ("Sea-Land"), a flag container carrier.
During my time with Sea-Land, I held a number of positions involving various aspects of
the shipping business. The majority of my years with Sea-Land directly involved
terminal operations. Prior to working for Sea-Land, I was a United States Army
Transportation Corp. Officer. I spent four (4) years on active duty and twenty-three (23)
years in the active Army Reserves, retiring as a Lieutenant Colonel. My military

2

responsibilities, both during my active time and Reserve time, involved the loading and discharge of sea-going vessels, i.e., container, break bulk and roll on/roll off. My cumulative experience with maritime shipping encompasses approximately 37 years.

## BACKGROUND OF THE DISPUTE

6.    At the time that I took over the management of the Terminal, the Terminal was a party to a certain Terminal Operating, Stevedoring and CFS (Container Freight Station) Service Agreement, made as of April 29, 1997, between HHCTI and SOUTH PACIFIC (the "Stevedoring Contract").

7.    Pursuant to Section XIX thereof, the initial term of the Stevedoring Contract was for eight (8) years and expired on September 30, 2005 (the "Initial Term"). The Stevedoring Contract afforded SOUTH PACIFIC an option to renew for an additional term of five (5) years. Upon receipt of notice of an intention to renew by South Pacific, NYCT prepared, tendered, and negotiated with South Pacific an extension of the Stevedoring Contract for a further term of five (5) years commencing as of October 1, 2005 in the form of Exhibit A to the Contract (Confidential Stevedoring Rate Schedule for Ecuadorian Line), dated as of October 1, 2005 (the "Confidential Rate Schedule"). Although Exhibit A was to have effect as of October 1, 2005, it was not executed by South Pacific until December 5, 2006 and by NYCT on December 26, 2006 following various negotiations between the parties. The entire Stevedoring Contract, including the Confidential Rate Schedule, is annexed hereto as Exhibit A.

8.    Pursuant to the Stevedoring Contract, the Terminal agreed to provide and erect a dedicated warehouse space of approximately 66,400 square feet, at least 50,000 square feet of which was to be refrigerated, in order to store South Pacific's cargo at the

3

Terminal. The warehouse was constructed in accordance with plans and specifications approved by South Pacific prior to the execution of the Contract and was required to be located adjacent to the guaranteed berth for South Pacific's vessels. The cost of the construction of the warehouse, known at the Terminal as the "Banana Building," was financed primarily by the Port Authority and the New York City Economic Development Corporation with contributions by each of South Pacific and the Terminal. The rent for the Banana Building was to be included in the per-box stevedoring rate provided in the Contract.

9.      According to the records of NYCT, the Banana Building was completed on or about July, 1999 and occupied by South Pacific's operations. Subsequently, an older warehouse facility which had been employed as an interim warehouse for South Pacific was demolished to make room for additional container storage capacity at the Terminal.

10.     Insofar as I am aware, from my dealings with issues related to the Banana Building and review of the Stevedoring Contract, this warehouse was constructed "in accordance with the plans and specifications approved by [South Pacific]" (Stevedoring Contract Section 2.5). The Stevedoring Contract provided that "the height of the warehouse should be sufficient to convert to a rack system for a second level of pallets" (Contract Section 2.5). The initial design, however, required by South Pacific involved only one level of pallets, and the capacity of the Banana Building to hold refrigerated fruit was approximately 1,750 pallets at which capacity the Banana Building remains to this day.

4



11.     In addition to the Banana Building, the Stevedoring Contract at Section II,

2.1(2)) requires the Terminal to provide:

> (2) Adequate yard space for receiving, delivering, parking,
> sorting, consolidating and handling loaded and empty
> containers on chassis and without chassis, as required.

12.     The Stevedoring Contract at Section II, 2.1(4) also requires the Terminal

to provide:

> (4) Adequate warehouse space, temperature and humidity
> controlled, adequate handling equipment and personnel in the
> on-dock container freight station to accommodate Carrier's
> LCL and perishable cargo requirements, including truck
> loading.

13.     The capacity of the Banana Building was limited by South Pacific's own

design requirements to approximately 1,750 pallets, and no increase of capacity to a rack

system for a second level of pallets had been initiated at the time of negotiation and

execution of the Confidential Rate Schedule. Therefore, the only capacity requirement of

which I am aware for palletized, non-containerized bananas in the Banana Building was

approximately 1,750 pallets. Such standard of adequacy remained as of the execution of

the Confidential Rate Schedule and the actual operation of the Confidential Rate

Schedule which was retroactive to October 1, 2005.

14.     Because South Pacific is able to arrange for some palletized cargo to

immediately be moved through the Banana Building to trucks and because the Terminal

could provide some stuffing of refrigerated containers to handle the overflow, it is within

the ability of the Terminal to handle about 2,000 pallets per vessel call within the time,

labor, and space limitations contemplated by the Stevedoring Contract and the

Confidential Rate Schedule.



### THE PREDICATES FOR THE RATES AND TERMS

### IN THE CONFIDENTIAL RATE SCHEDULE

15.    The terms and rates agreed to by the parties in the Confidential Rate

Schedule were based upon the pro forma or existing standard of operations and level of

throughput, between the parties.

16.    Section I of the Confidential Rate Schedule states:

> **Based on current pro forma**, vessel will have two days to
> complete work.  Terminal reserves the right due to
> extraordinary and special circumstances to require the vessel to
> finish in one day.
>
> **The rates quoted are predicated on a pallet friendly vessel
> which allows for the use of four electric fork lift trucks in
> the hatch and ship's cranes or derrick with minimum eight
> metric ton lifting capacity.  At least one-half of each hatch
> square is to be pre-slung.** (emphasis supplied)

17.    The Confidential Rate Schedule was negotiated and agreed upon based

upon a standard: the currently existing manner of operation for South Pacific's vessel

calls and cargo throughput at the time the Confidential Rate Schedule was negotiated.

This standard was identified in the Confidential Rate Schedule as the "current pro forma"

*i.e.*, the model which provided the basis for the rendering and pricing of services and the

procurement and assignment of longshore labor.  To my knowledge, the use of the term

"pro forma" to describe a contractual basis is common in the shipping industry.

18.    The pro forma on which the terms and rates set forth in the Confidential

Rate Schedule were based had been in place since January, 2000, when South Pacific

began using five "Island Class" vessels to deliver bananas on a weekly basis to NYCT.

A South Pacific vessel arrived each week, generally on Thursday or Friday, discharged

6



approximately ½ of the bananas aboard (about 2000 pallets and 160 containers), and departed generally within 24 hours of arrival at NYCT for Europe, where it discharged the remainder of the bananas. Another South Pacific vessel generally arrived at NYCT on a Tuesday of each week from Europe to pick up container cargo that was delivered to Ecuador. Attached as Exhibit B is a notice from Gary White of South Pacific to Frank Chimento and Frank Scollo of Howland Hook (NYCT's predecessor). This notice describes the pro forma and lists the specifications for the five Island Class vessels that South Pacific used from January, 2000 to December, 2006.

19.    The pro forma on which the terms and rates set forth in the Confidential Rate Schedule were based included the following items, among others, all of which applied to the Island Class vessels and their manner of operation: 1) discharge of approximately 2000 non-containerized pallets of bananas or other cargo from the vessel; 2) discharge of approximately 160 containers from the vessel; 3) that the vessel be capable of being fully worked (discharged and loaded) within two days (and within one day under special circumstances); 4) that the vessel be "pallet friendly"; 5) that the vessel "allow for the use of four electric fork lift trucks in the hatch"; and 6) that the vessel's cargo be configured so that "at least one-half of each hatch square is to be pre-slung." This last item means that at least ½ of the top layer of pallets must come already "slung" with handles for ease of removal.

20.    The parties understood that the rates and terms stated in the Confidential Rate Schedule **were predicated on the current pro forma** and would apply only if the current pro forma was maintained. If the current pro forma was altered, rates and terms stated in the Confidential Rate Schedule would not apply.

7



21.    Beginning in January, 2007, South Pacific substantially altered the pro forma by substituting "Ocean Class" vessels for the "Island Class" vessels that it had predominantly been using since January 2000 to transport its cargo to NYCT, with few minor exceptions due to drydocking schedules.

22.    The Ocean Class vessels contained a substantially different mix of non-containerized palletized bananas than did the Island Class vessels. Whereas the Island Class vessels discharged approximately 2000 pallets and 160 containers per call, the Ocean Class vessels discharged approximately 4000 pallets and only approximately 66 containers per call. Stevedoring pallets as opposed to refrigerated containers is much more labor- and equipment-intensive and has taxed the resources of NYCT which, as noted above, could only handle approximately 2,000 non-containerized pallets per vessel call within the time, labor, and space limitations contemplated by the Stevedoring Contract and the Confidential Rate Schedule.

23.    In this connection, I refer to the following data depicted on Exhibit C to this Declaration:

**Volume of Boxes from Non-Containerized Palletized Cargo 2001-2007**

| 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | Average 2001-06 | Difference Between 2007 and 2001-06 Average |
|------|------|------|------|------|------|------|---------|------------|
| 353,766 | 366,709 | 315,873 | 333,070 | 385,590 | 350,309 | 706,656 | 350,886 | 355,770 |

Exhibit C hereto shows the throughput of boxed fruit tendered in non-containerized pallets by South Pacific to the Terminal, for the first seven (7) months of each year from 2001 through 2006 (i.e., the period of the pro forma) and then for 2007. For each of the first seven months of each year between 2001 to 2006, South Pacific tendered non-

8



containerized pallets containing an average of 350,886 boxes of fruit, while for each of the same seven (7) months in 2007 (January-July), South Pacific tendered non-containerized pallets containing 706,656 boxes. This represents a difference of 355,770 boxes per month, more than twice (or 200%) the number of boxes from non-containerized pallets tendered for stevedoring and terminal services during the comparable periods in the prior six (6) years.

24.    What South Pacific has done in terms of demands placed on the Terminal over the past seven (7) months is even more graphic when it is recognized that South Pacific tendered non-containerized pallets containing an average total number of 2,807,089 boxes for the first seven (7) months of 2001 through 2006 and that it tendered such pallets containing 5,653,244 boxes for the first seven (7) months of this year, a difference of 2,846,155 boxes.

25.    The vastly increased non-containerized pallet throughput is not the only way South Pacific has altered the pro forma. The Ocean Class vessels, which South Pacific began predominantly using in January 2007 do not initially "allow for the use of four electric fork lift trucks in the hatch" as the Island Class vessels did, and as explicitly required by the Confidential Rate Schedule. In fact, a maximum of one electric fork lift truck can be used at one time in one of the hatches on the Ocean Class vessels, and the other hatches can initially be worked with a maximum of two electric fork lift trucks. This means that the vessels take much longer to unload.

26.    Nor are the Ocean Class vessels "pallet friendly", as were the Island Class vessels and as explicitly required by the Confidential Rate Schedule. In fact, they contain steel partitions around which the workers must maneuver in order to discharge the pallets.

9

27.     Nor do the Ocean Class vessels permit configuration of cargo so that "at least one-half of each hatch square is to be pre-slung," as did the Island Class vessels and as explicitly required by the Confidential Rate Schedule. Instead, only approximately one-third of each hatch square on the Ocean Class vessels is pre-slung.

28.     For all of the above reasons, the Ocean Class vessels are incapable of being fully worked (discharged and loaded) within two days (and within one day under special circumstances) as were the Island Class vessels (when normally discharging 2,000 non-containerized pallets) and as explicitly required by the Confidential Rate Schedule. Instead, the Ocean Class Vessels require two-and-a-half (2 ½) to three (3) days for discharge and loading, despite the fact that NYCT has worked them with multiple gangs and overtime. The Island Class vessels, by contrast, could be fully worked in less than twenty-four (24) hours.

29.     The rates and terms of the Stevedoring Contract and the Confidential Rate Schedule were never intended to apply to a monthly cargo throughput of more than twice the number of non-containerized pallets of fruit previously handled at our Terminal.

30.     Simply stated, the throughput which South Pacific is sending to our Terminal is now twice the amount of non-containerized palletized cargo as the pro forma, notwithstanding that the refrigerated capacity of the Banana Building has not increased so far by a single banana box.

31.     Nor were the rates and terms of the Stevedoring Contract and the Confidential Rate Schedule intended to apply where the vessels used by South Pacific, in direct violation of the Stevedoring Contract and the Confidential Rate Schedule: 1) were incapable of being fully worked within two days (and within one day under special

10



circumstances); 2) were not "pallet friendly"; 3) did not allow for the use of four electric fork lift trucks in each of the ship's hatches; and 4) were not configured so that "at least one-half of each hatch square is to be pre-slung."

## WHAT PRECIPITATED THESE ACTIONS BY PLAINTIFFS

32.    South Pacific and its affiliated plaintiff, Pacific Fruit, are now discharging into the Terminal twice the cargoes of palletized fruit that they were tendering during the past six (6) years, I believe, because developments in the European Union (the "EU") are forcing them to change their business model. As described in Exhibit D, the EU recently began imposing tariffs of $234 per ton on bananas from Ecuador and other Latin American and Central American countries in order to favor imports from former colonies in Africa and the Caribbean. By reason of this situation, it appears that South Pacific has mainly withdrawn its Island Class vessels from service to New York so that it may send those vessels, which hold more containers and are better able to ship other products, to the EU, and substituted its Ocean Class vessels in New York with the consequences to our Terminal and stevedoring operations as I will describe below.

## CONSEQUENCES

33.    Contractually material consequences flow from South Pacific's decision to increase its non-containerized palletized cargo in an amount which may approach six million (6,000,000) boxes per year and to change its vessels to a class which is much more difficult to work. They include the following:

> a. Each fruit box tendered to the Terminal needs to be maintained under
> refrigeration. Since the Banana Building leased to South Pacific is
> able to accommodate only approximately 1,750 pallets, NYCT is



forced to take measures upon the discharge of each vessel to provide the required refrigeration for more than double the number of non-containerized pallets which can be accommodated in the Banana Building. We have been accomplishing this feat by having to stuff the excess boxes from each voyage into refrigerated containers which are positioned on the Terminal as temporary storage. These refrigerated containers are powered from existing reefer plugs on the Terminal, by generator sets secured to the containers or by modular power packs that the Terminal rents on behalf of South Pacific.

b. The stuffing of containers is a complex operation because it requires us to find sufficient chasses to mount the refrigerated containers. All these containers need to be cleaned, maintained, and serviced, and the stuffing of containers with boxed fruit needs to be performed in special ways to assure adequate ventilation of the cargo and to avoid spoilage. Depending upon the stowage scheme, each container will only hold between eighteen (18) and twenty (20) pallets of boxed fruit. It is not hard to appreciate all of the skilled labor, equipment, acreage and time required to move these great quantities of boxed fruit into container storage on the Terminal.

34.     Although the Stevedoring Contract and Confidential Rate Schedule provide for payments based on volume of the cargo handled and the services rendered, as the preliminary studies we have made indicate (see Exhibit E), these charges do not nearly compensate us for loss of productivity and extra costs associated with the

12



increased volume of pallets and the fact that the Ocean Class vessels are less easily worked.

35.     We also have great difficulty in finding sufficient labor to meet the requirements of South Pacific's Ocean Class Vessels. Whereas the Island Class Vessels required, at the most, two gangs to work the vessel, the Ocean Class Vessels have required three and even four gangs even in order to complete work within 2 ½ to 3 days (greater than the amount of time required under the Confidential Rate Schedule).

36.     On certain days when container vessels call at our Terminal, we do not have enough labor gangs to work both the container vessels and South Pacific's vessel at the same time. Terminals do not control the sourcing of their own labor. The provision of labor to a container terminal in this Port is controlled by the unions. Union labor and assignments to labor gangs gravitates towards container vessels because the pay is more lucrative, the conditions safer, the work easier, and many longshoremen no longer have any breakbulk experience. While extra labor can be requested from union locals in Brooklyn, Manhattan, and Bayonne there is no assurance of procuring adequate and qualified labor on a regular basis or that such labor has the requisite skills to discharge breakbulk cargo and to operate the necessary equipment.

37.     While we would have had sufficient labor to work South Pacific's Island Class vessels based on the pro forma, the combination of the following circumstances means that NYCT will not have sufficient labor to work South Pacific's vessels if South Pacific were to continue having its vessels arrive on a Wednesday, Thursday or Friday: 1) the Ocean Class Vessels require so much more labor and take so much longer to work, 2) the Terminal has new business coming as of this week (which new business, as

13



plaintiffs well know, NYCT had been negotiating for approximately three years), and 3) the provision of labor gangs are controlled by unions, as discussed above.

38.    The reintroduction of the Ocean Class vessels to the Terminal also introduces various problems relating to productivity and safety. The hold configuration of the Ocean Class vessels is such that they do not meet the requirement of being pallet friendly. Whereas in most holds, we expect to be able to work four (4) forklifts in the square of the hatch, such is not generally feasible in the Ocean Class vessels because of the configuration of the holds and the stowing practices of plaintiffs; to attempt to work that many forklifts would be unsafe.

39.    The general condition of South Pacific's Ocean Class vessels leaves much to be desired. Broken deck plates, confined working areas, and other conditions precipitate concerns over safety in discharging the vessels.

40.    While the Terminal is being asked to guarantee a berth and other facilities on Wednesday, Thursday, and Friday, South Pacific's vessels are missing schedule and are having increasing difficulty meeting their arrival dates due to Panama Canal congestion.

41.    At any hearing on the merits of the dispute with plaintiffs, NYCT is prepared to offer strong proofs of the extra time, extra costs, and other factors necessitated by South Pacific's failure to abide by the requirements of the Stevedoring Contract and Confidential Rate Schedule, and the pro forma on which those documents were negotiated.

14



42.     Because of all of the above factors, plaintiffs are unlikely to succeed on the merits of this dispute, and NYCT respectfully requests that this Court deny plaintiffs' motion for a preliminary injunction.

43.     Additionally, the public interest does not favor issuance of preliminary injunction. To require NYCT to work South Pacific's Ocean Class vessels on a Wednesday/Thursday/Friday schedule (and for no additional compensation) not only raises safety concerns, but would threaten NYCT's ability to service other business in the Terminal. Consequently, it would also threaten the significant investment by the Port Authority (funded by tolls on the public) in NYCT to promote NYCT as a premier container terminal in the Northeast.

44.     As NYCT sees it, South Pacific has two options: 1) to revert to the pro forma it employed from 2000-2006, on which the cost structure and terms of the Confidential Rate Schedule were based, using its Island Class vessels to deliver approximately 2000 non-containerized pallets and 160 containers; or 2) to continue to use its Ocean Class vessels, but to berth them at a time when the additional work such vessels require would not interfere with the other work of the terminal (i.e., a Monday/Tuesday/Wednesday pro forma, arriving Monday or Tuesday), and to pay additional compensation for the additional work required.

45.     NYCT had a long and mutually productive relationship with South Pacific until January of this year, and would like to maintain this relationship on terms that are fair and commercially viable to both parties.

I declare under penalty of perjury that the foregoing is true and correct.  Executed

in New York, New York, on August ⧸, 2007.

James J. Devine

**EXHIBIT A**

5027-9



HILL BETTS & NASH LLP

# EXHIBIT A

CONFIDENTIAL STEVEDORING RATE SCHEDULE FOR ECUADORIAN LINE

Dated: October 1, 2005

Between NEW YORK CONTAINER TERMINAL, INC. (the "Contractor") and SOUTH PACIFIC SHIPPING CO. LTD. (D/B/A ECUADORIAN LINE)(the "Carrier")

I. **STEVEDORING RATES**

### PALLETIZED BANANAS/FRESH FRUIT

#### Per Box Rate

| | |
|---|---|
| 10/01/05-09/30/2006 | $.49 ½ |
| 10/01/06-09/30/2007 | $.50 ½ |
| 10/01/07-09/30/2008 | $.50 ½ |
| 10/01/08-09/30/2009 | $.52 |
| 10/01/09-09/30/2010 | $.53 |

Carrier also has the option to extend the contract for an additional five years, through 2015, at rates mutually agreed upon.

The above rates include straight time labor costs from the hold of the vessel through to the truck. This rate includes all costs associated with unloading perishable cargoes from the vessel to the warehouse, storage in a dedicated refrigerated warehouse facility, and the loading of the product onto your customer's trucks.

New York Container Terminal is committed to safe and quality cargo handling. We will maintain ongoing quality improvement programs and we will constantly monitor our productivity and damage levels and train our employees on the proper way to handle refrigerated cargoes.

The above rates include wharfage and will permit straight time stevedoring from the hours of 0800 until 1700 excluding 1200 to 1300 from Monday through Friday, exclusive of holidays. A list of holidays is included along with our hiring guidelines.

Based on current pro forma, vessel will have two days to complete work. Terminal reserves the right due to extraordinary and special

**CONFIDENTIAL RATE SCHEDULE FOR ECUADORIAN LINE**                    PAGE    **2**
**DATED:  October 1, 2005**

circumstances to require the vessel to finish in one day.

The rates quoted are predicated on a pallet friendly vessel which
allows for the use of four electric fork lift trucks in the hatch
and ship's cranes or derrick with minimum eight metric ton lifting
capacity. At least one-half of each hatch square is to be pre-
slung.

In the event that the Carrier must charter vessels with less than
eight ton gear, Contractor will allow the Carrier three ships per
year with gear down to five metric ton capacity at the normal rates
set forth in this Exhibit A. Beyond these three ships, or for ships
with gear under five ton capacity, Contractor will receive a rate
differential which will compensate it for the resultant loss in
productivity. The rate differential will be based on crane lifting
capacity and will be applied as follows: Actual productivity to be
compared to the average adjusted gross productivity of the last ten
(10) vessels to determine excess time required to work the vessel.
Any additional time versus that calculated at average productivity
will be charged to Carrier at Detention Rates.

## CONTAINERS

| YEAR | LOAD | EMPTY | |
|------|------|-------|---|
| 10/01/05-09/30/2006 | $197.00 | $192.00 | per lift |
| 10/01/06-09/30/2007 | $204.50 | $199.50 | per lift |
| 10/01/07-09/30/2008 | $204.50 | $199.50 | per lift |
| 10/01/08-09/30/2009 | $207.00 | $202.00 | per lift |
| 10/01/09-09/30/2010 | $210.00 | $204.00 | per lift |

Security Fee                                    $4.00 per loaded
                                                container

Lashing of containers, if applicable           $7.00 per unit

Restowing container at Carrier's request:       $148.00 per lift


Overheight/overwidth/overlength or
damaged containers which can only be lifted by emergency gear
is to be billed at pick rate plus Extra Labor/Detention basis

Transshipment of loaded containers discharged from another

**CONFIDENTIAL RATE SCHEDULE FOR ECUADORIAN LINE**                              PAGE  3
**DATED: October 1, 2005**

vessel, reloaded to another vessel or barge at New York Container
Terminal                                        $165.00 per unit

Gang Rollover (Receiving vessel only)           ½ hour Detention rate


Inclusions:

The above box rates are quoted on a per move basis and include the
following:

1. Above rate includes stevedoring, on straight time, crane rental,
tractors, top loaders, assisting in receiving and delivery,
clerking and checking, weighing of export containers, furnishing
stowage plans including a final, T.I.R. gate inspection and
reports, security and wharfage. The rates quoted above are based on
a semi-wheeled operation. Normal gate operating hours will be from
0600 until 1630 for containers and banana trailers and 0800 until
1630, excluding 1200 to 1300, for break bulk and LCL loads other
than banana trailers.  Carrier to have the ability to preload and
stage trailers of product on the facility at any hour of the day or
night (including weekends and holidays) consistent with terminal
and maritime security policies and conditions that are in place at
that time.

2. Loading/unloading of containers on/off vessel using a shore
container gantry crane to/from a point of rest in the yard.

3. Yard and office support while vessel is working.

4. Gate, TIR, mounting/grounding for vessel related cargo during
regular terminal hours.

5. The cost of standby for vessel, detention and dead time of
vessel gangs or any delays incurred which are beyond the control of
the Contractor are excluded from the above listed basic service and
will be charged at the rate set forth in Section VII hereof.


6. All shore side handling equipment necessary for yard and vessel
operations inclusive of two shore side container gantry cranes.

7. Inbound TIR inspection of Carrier's equipment.

8. Included in the rate is terminal storage for empty containers up
to 425 units per day.  When allowance has been reached, Carrier
shall pay $1.60 per container/per day.

**CONFIDENTIAL RATE SCHEDULE FOR ECUADORIAN LINE**          PAGE    4
DATED: October 1, 2005

9.  Included in the rate is terminal storage for up to 35 trailers
per day.  When allowance has been reached, Carrier shall pay $75.00
per trailer/per day.  For trailer to be left on terminal, trucker
must sign hold harmless and indemnification agreement.

10. Compensation, Public Liability and Property Damage Liability,
as well as all other Federal and State Insurances. New York
Container Terminal agrees to maintain in full force and effect all
insurance policies and will, upon request, provide copies of all
insurance certificates.

11. The Carrier will be responsible for any unfunded pension
liability which might accrue to the vendor through its collective
bargaining agreements, as the result of services provided to
Carrier hereunder.

Exclusions:

1.Detention will be billed, on a per gang-hour basis, for any
nonproductive time. The first fifteen minutes of detention per gang
on any ship will be free.

2.Repair of containers or chassis excluding Roadability inspection.
The Carrier can supply its own parts or Contractor will provide
them. Contractor will provide the Carrier with a parts catalog.

3. Late Gate and/or weekend, holiday gates for containers, when
requested by the Carrier, will be billed in accordance with ILA
manning requirements.

Costs for Gate while vessel working (Mon ▮ Fri):      $7,900.00
Above rate based on 4 hour operation, 5:00pm ▮ 9:00pm

Costs for Gate during non-vessel operation (Mon ▮ Fri):$ 17,000.00
Above rate based on 4 hour operation 5:00pm ▮ 9:00pm

Costs for Gate during non-vessel operation (Weekends / Holidays):
Based on 4 hour operation                          $ 17,500.00

4. The rate does not include demurrage.  Demurrage rates will be
based upon New York Terminal Tariff Rates.  Contractor will honor

**CONFIDENTIAL RATE SCHEDULE FOR ECUADORIAN LINE**          PAGE  5
**DATED: October 1, 2005**

Carrier's service contracts up to 21 calendar days where applicable. Export demurrage, after 7 calendar days free time, will be billed to the account of the Carrier. For containers released to General Order, where demurrage and/or exam liens remain unpaid for more than 30 days from date of delivery, said charges shall be the responsibility of the carrier.

5. The rate does not include New York Shipping Association royalties, assessments and or any royalties, assessments or fines if applicable, which will be direct cost to Carrier.

6. If a gang is ordered to handle containers after break bulk operation is finished, carrier is responsible for any and all stand-by/detention time associated with this activity. (15 minutes free is excluded from this scenario.) Terminal will make best effort to minimize standby cost of labor which would otherwise be employed during non-productive time.

7. Any platform/warehouse activity that is required on overtime hours will be billed in accordance with the ILA manning requirements. (I.e. non vessel related activity)

8. In the event Carrier cancels a labor order which has been previously placed, Carrier remains liable for all labor costs which can not be either cancelled or set back.

## II. TERMINAL ACTIVITIES

### A.   Reefer Operations

Up to 160 reefer plugs will be made available to accommodate the Carrier's needs for first six months of contract. Thereafter 175 reefer plugs will be made available.

#### Reefer Plug Service/Monitoring/Electric:

∎S/T First day plug in/Monitoring
                              $61.94 per container per day
∎Each subsequent day monitoring
    –includes electric      $53.11 per container per day

–Boxes to be monitored twice per day.

CONFIDENTIAL RATE SCHEDULE FOR ECUADORIAN LINE
DATED: October 1, 2005

PAGE  6

| | |
|---|---|
| Pre Trip (test only on line's request) | $96.84 per unit |
| Pre Trip and Precool including placement | $121.97 per unit (pass or fail) |
| Reefer Wash-Out | $64.54 |
| Genset Pre Trip | $96.84 |
| Fuel | At cost, plus 15% |

Note: Pigtails to be supplied by lines

B.  TIR/MOUNT/GROUND

Miscellaneous TIR and Mount/Ground charges, if required for containers not associated with vessel moves and authorized by the Carrier:

-Miscellaneous TIR, i.e., IT moves, etc.     $27.00 per TIR
-Miscellaneous Mount/Ground                  $42.00 per move

C.  Import In for Re-Delivery or Export load received for vessel but canceled and delivered from terminal.   $75.00 per unit

D.  Receiving/Delivery of empty containers not related to thru-put discharge or load, vessel move.   $42.00 per unit/ per gate move

E.  Container handling charge for container or cargo inspection/survey includes spotting with CY door opening/closing and resealing.
                                              Per Terminal tariff

F.  Chassis Change                            $40.00 per unit

G.  Booking Rollovers:
    Admin Fee                                 $35.00 per unit
    (Includes holding containers for US Customs Exams)

H.  Change of container Status (Off Hire / For Sale)to Good Order or Bad order:                          $45.00 per unit

**CONFIDENTIAL RATE SCHEDULE FOR ECUADORIAN LINE**          **PAGE**  7
**DATED: October 1, 2005**

I.    Physical movement of containers due to booking rollover or
      status change:                                    $45.00 per unit/
                                                        Per lift


J.    Administration Fee for cancellation of Demurrage:
                                                        $35.00 per unit


III.  <u>CFS ACTIVITIES</u>


A.    <u>Containers ▌ Stuffing / Stripping</u>
      <u>Fruit Products</u>

         Bananas/Plantains 20'/40'           $335.00 per container
         Pineapples/mangoes 20'/40'          $450.00 per container
         Overnight stuffers to be delivered
         as FCL                              $160.00 per container

B.    <u>Containers</u>
      <u>Strip and Swing</u>

         Palletized/Unitized/20 ft. containers   $377.15 per container
         Palletized/Unitized/40 ft. containers   $630.40 per
      container

C.    <u>Strip and Swing</u> (unitized cargo)

         Loose floor loaded cargo/20 or 40 foot container $3.72wt

CONFIDENTIAL RATE SCHEDULE FOR ECUADORIAN LINE          PAGE    8
DATED:  October 1, 2005

There will be a minimum charge of $187.50 per container. The maximum charges will be $617.46 for a 20 foot container and $910.57 for a 40 foot container.

Strip and swing rates will include all receiving charges and will be predicated on moving the cargo directly from a container into the customer's waiting truck.

D.    Stuffing/Stripping-General Cargo

Rate includes assisting receiving/delivery and normal securing and materials used (Chocking and Bracing).

|      |                   |
|------|-------------------|
| 20'  | $428.88 per unit  |
| 40'  | $657.34 per unit  |

E.    Stuffing
Autos■ stuffing into 40' containers      $189.44 per vehicle
■ includes prep of vehicles, normal securing. Carrier to provide securing materials.

F.    Government Inspections (if for account of the Carrier)

USDA Tailgate Inspection               $154.00 per unit*
(This refers to container being taken to LCL warehouse
 platform for inspection by AQI at request of carrier.)

VACIS Exam                             $328.00 per unit*

* If the above activity pertains to refrigerated containers an addt'l reefer handling fee for plugging/unplugging will apply at the rate of:                        $43.00 per unit

USDA Strip or Stuff Inspection
-Strip and Stuff-Palletized/Unitized 20 ft. containers

|                   |                        |
|-------------------|------------------------|
| Full Stripping    | $474.14 per container  |
| Partial Stripping | $341.60 per container  |

-Strip and Stuff-Palletized/Unitized 40 ft. containers

CONFIDENTIAL RATE SCHEDULE FOR ECUADORIAN LINE                    PAGE   9
DATED: October 1, 2005

```
                        Full Stripping       $707.98 per container
                        Partial Stripping    $571.10 per container
```

G.  Loading flat racks, open tops, over-size pieces, chocking and
bracing at cost and material.

```
                                            Extra Labor basis
```

H.   Strip and Sort pallets by size, type container $336.21 per
20' container

```
   Strip and Sort pallets by size, type       $502.16 per 40'
   container
```

IV.  BREAKBULK CARGO

```
     A. Stevedoring: Extra Labor Basis
     B. Terminal:    $17.50 per 2240 lbs. or 40 CFT, whichever is
                          greater
```

V.   MAINTENANCE

```
     A. Installing or removing gen. set    $47.74 per unit on
        including drayage.                 $47.74 per unit off

     B. FHWA inspection                       $65.84 per unit

     C. Genset PM                             $161.38 per unit
```

Carrier agrees to engage Contractor for all maintenance and repair
to be performed at the terminal upon Carrier's containers, chassis,
reefer units and generator sets pursuant to terms, conditions and
rates to be mutually agreed upon.

```
Tires-
-Fixing a flat                              See catalog
-Repair of tire/dismount/mount              See catalog


Welder/Burner/Mechanic                      $63.50 per man hour

Mechanic-Electrical Problems-time and materials
```

**CONFIDENTIAL RATE SCHEDULE FOR ECUADORIAN LINE**
**DATED: October 1, 2005**

PAGE  **10**

$63.50 per man hour

Storage of damaged or OOS equipment in excess of 30 calendar days
without authorized approval for repairs:    $3.00 per unit/per day

DOCKAGE (LOA)- Per Port Authority tariff. (Subject to increases
per Port Authority)

| | |
|---|---|
| Under 400 | $3.75 per foot per day |
| 401-500 | $4.50 per foot per day |
| 501-600 | $5.25 per foot per day |
| 601-700 | $6.50 per foot per day |
| 701-800 | $7.25 per foot per day |
| 801-900 | $7.75 per foot per day |

VI. MISCELLANEOUS ACTIVITIES

   A. Handling ship's lines on overtime: (No charge for docking
     and undocking on straight time)
     [Straight-time is 0800 to 1700 hrs. on week days
     excluding 1200 to 1300 hrs.]

| WEEKDAYS: | Docking | Undocking |
|---|---|---|
| 0700 ▮ 0800 | $ 985.00 | $ 985.00 |
| 1200 ▮ 1300; 1700 – 1900 | $1250.00 | $1250.00 |
| 1900 – 0700 | $1400.00 | $1400.00 |
| WEEKENDS: | $1900.00 | $1900.00 |

   Once vessel lets go, line handling period has ended.    If
vessel returns, new line handling period shall commence.

   B. Heavy lift charges:

     Heavy lifts up to a maximum of 40 LT billed at extra
     labor which covers stevedoring and terminal. Any lifts
     exceeding 40 LT must be by prior special arrangement.

CONFIDENTIAL RATE SCHEDULE FOR ECUADORIAN LINE                    PAGE   11
DATED:  October 1, 2005

C. Handling vessel stores                    Extra labor

D. Potable water for the vessel is available at 50¢ per
   metric ton. There will be no hookup charge if crew
   performs this service.

E.   Equipment                  Extra Labor Basis Hourly Charges

        Container Crane                $511.86 per hour
        Container Top loader           $ 85.13 per hour
        Forklift up to 8,000 lbs.      $ 17.24 per hour
               up to 15,000 lbs.       $ 24.25 per hour
               up to 25,000 lbs.       $ 34.48 per hour
               over 25,000 lbs.        $ 46.93 per hour
        Yard Tractor                   $ 39.87 per hour
        Flatbed                        $ 11.85 per hour

**CONFIDENTIAL RATE SCHEDULE FOR ECUADORIAN LINE**
**DATED: October 1, 2005**

PAGE **12**

VII. MAN-HOUR RATE SCHEDULE

Ship's Gang &
Terminal Unit Rates: Extra Labor  Detention  O/T Diff.  M/H Diff.

Per Gang Employed   $1,838.79   $1,666.25   $1,193.80   $2,268.25
including staff & equipment

Extra Labor gang hour rate is applicable when cargo other than
standard containers are discharged or loaded to/from vessels.

Lashing rates may be applicable on cargo requiring extra labor
activities.

The extra labor rates do not include equipment which will be
charges in accordance with Section VI; Item F.

| Man-hour Rates: | S/T | O/T | M/H | O/T Diff. | M/H Diff. |
|---|---|---|---|---|---|
| Terminal/ Warehouse Labor | 60.20 | 87.08 | 108.58 | 26.88 | 48.38 |
| Reefer Maintenance: | | | | | |
| Foreman | 65.50 | 98.00 | 127.00 | 32.50 | 61.50 |
| Mechanic | 64.50 | 96.00 | 125.00 | 31.50 | 60.50 |
| Chassis/Cont. Repair: | | | | | |
| Foreman | 63.80 | 95.00 | 126.60 | 31.20 | 62.80 |
| Mechanic | 62.80 | 93.00 | 124.60 | 30.20 | 61.80 |
| Crane/Power | | | | | |
| Foreman | 58.00 | 83.00 | 103.00 | 25.00 | 45.00 |
| Mechanic | 54.00 | 79.00 | 99.00 | 25.00 | 45.00 |
| Lashing/Extra Labor | | | | | |
| Foreman | 63.80 | 95.00 | 126.60 | 31.20 | 62.80 |
| Lasher | 62.80 | 93.00 | 124.60 | 30.20 | 61.80 |
| Lashing/Detention | | | | | |
| Foreman | 63.80 | 95.00 | 126.60 | 31.20 | 62.80 |
| Lasher | 62.80 | 93.00 | 124.60 | 30.20 | 61.80 |

**CONFIDENTIAL RATE SCHEDULE FOR ECUADORIAN LINE**
**DATED: October 1, 2005**

PAGE   **13**

For prices of parts and standard allotment of time on lenses, bulbs, mud flags and sealed units (marker, stop and tail), please see our maintenance and repair catalog provided separately.

Plugging and unplugging containers on/off vessel will be performed on extra labor basis at the following man hours rates: (Minimum 4 hours; 2 men)

| | | |
|---|---|---|
| Straight time: | Per man hour | $63.80 |
| Overtime: | Per man hour | $95.00 |
| Meal Hour: | Per man Hour | $126.60 |

VIII. DOCUMENTATION

Carrier shall provide Contractor all necessary information and instructions on a timely basis to allow Contractor to provide efficient service. Documentation shall be prepared and processed by the Contractor in a form mutually agreed upon by the Carrier and Contractor. In connection with the above, the Contractor shall prepare the following documentation:

1. Outbound vessels stowage plan
2. Ship's loading report
3. Ship's discharge report
4. Daily records of equipment interchange reports (via internet)
5. Daily container activity report (in and out)
6. Outbound container load plans for LCL containers
7. List of undelivered LCL cargo following vessels expiration of free time
8. List of undelivered FCL (containers) following vessels expiration of free time
9. Daily warehouse platform delivery reports
10. Daily strip and swing and/or stripping/stuffing recap reports
11. Banana warehouse inventory report

IX. LABOR RATE ESCALATION

**CONFIDENTIAL RATE SCHEDULE FOR ECUADORIAN LINE**                    PAGE   14
**DATED: October 1, 2005**

The labor portion of the above rates for palletized bananas and fresh fruit is 70% and the fixed portion is 30%. The labor portion of the above rates for containers is 70% and the fixed portion is 30%. The labor portion is subject to escalation based on increases or decreases in wages, taxes, fringe benefits, etc. Thereafter it shall be subject to an increase mutually agreed to based on actual cost increases. The fixed portion of all rates shall be adjusted annually on October 1st for all NYSA/ILA related rates and January 1st for all METRO/ILA related rates, respectively based on percentage increases in the Consumer Price Index (CPI) as published by the Department of labor for the New York Metropolitan area.

ORDERING TIMES AND STARTING TIMES; STRAIGHT, OVERTIME, ETC.:
▌ Monday thru Thursday ordering by 1 p.m. for same day 1900 or 2300 and for next, 0700, 0800 or 1300.
▌ Friday ordering by 1 p.m. for same day 1900 and 2300, Saturday 0700 , 0800 1300 or 1900, Sunday 0700, 0800, 1300, 1900 or 2300 and Monday 0700, 0800 or 1300.
▌ Straight time is from 0800 to 1200 and 1300 to 1700 Monday thru Friday, excluding Holidays.

CANCELLATION AND SET BACK SCHEDULES:
▌ Sunday 0800 start can be cancelled or set back by 0600 Saturday.
▌ Monday 0800 start can be cancelled or set back by 0600 Monday.
If Monday is a holiday, Tuesday 0800 start will apply.
   All other labor orders can not be cancelled or set back after being ordered.

THE FOLLOWING ARE THE N.Y.S.A. - I.L.A. ▌ PAID HOLIDAYS▌ :

Columbus Day

**CONFIDENTIAL RATE SCHEDULE FOR ECUADORIAN LINE**
**DATED:  October 1, 2005**

PAGE    **15**

Election Day

Veterans Day

Thanksgiving Day

Christmas Eve

Christmas Day

New Year's Eve

New Year's Day

Martin Luther King's Birthday

Lincoln's Birthday

Washington's Birthday

Gleason's Birthday

Good Friday

Memorial Day

Independence Day

Labor Day

**CONFIDENTIAL RATE SCHEDULE FOR ECUADORIAN LINE**    PAGE    16
**DATED: October 1, 2005**

```
The  foregoing  is  hereby  acknowledged  and  agreed  to,  subject
to  the  execution  of  the  Contract:
```

```
    SOUTH  PACIFIC  SHIPPING  CO.              NEW YORK CONTAINER
  LTD.  (d/b/a/ ECUADORIAN LINE)             TERMINAL, INC.
              (Carrier)                          (Contractor)


  By: _____            By: _____
        Diogenes Villacis
  Title:  President  South  Pacific          Title:  VICE PRESIDENT
  Shipping  Co.,  Ltd.


  Date: December 5ᵗʰ, 2006                    Date: December 26 2006
```

50270009  Executed Original



RECEIVED

JUN 26 1997

HILL BETTS & NASH LLP

## TERMINAL OPERATING, STEVEDORING AND CFS SERVICE AGREEMENT

THIS AGREEMENT, made and entered into as of the ___ day of April, 1997 by and between **HOWLAND HOOK CONTAINER TERMINAL, INC.** a corporation organized and existing under the laws of the State of New York (hereinafter the "Contractor"), and **SOUTH PACIFIC SHIPPING COMPANY LIMITED (d/b/a ECUADORIAN LINE)**, a corporation organized and existing under the laws of Bermuda (hereinafter the "Carrier").

### SECTION I.  UNDERTAKINGS AND CONSIDERATION

In consideration of the covenants and undertakings of Carrier as hereinafter set forth, the Contractor agrees to provide and perform, at its marine terminal facility located in the Port of New York at Staten Island (hereinafter the "Terminal"), terminal, stevedoring and break/bulk LCL cargo (including palletized fresh fruit) handling, and Container Freight Station services, for break/bulk cargo and containers to be loaded onto or discharged from vessels owned, operated, chartered or controlled by the Carrier (hereinafter "Carrier's vessel") used by the Carrier for service between various ports and the Port of New York. The Carrier agrees to utilize exclusively, the Contractor's terminal for all of the above described services it requires in the Port of New York, for the term of this agreement.

### SECTION II. CONTRACTOR'S OBLIGATIONS

The Contractor undertakes to furnish the following services at the agreed rates set forth in the Rate Schedule attached hereto as Exhibit "A" and made a part hereof.

#### 2.1  GENERAL

(1) A single berth, located at the south end of the wharf, of adequate length to dock Carrier's vessel is guaranteed upon arrival, Wednesday, Thursday and Friday. On any other day, vessel will be given priority for a berth, and at least one crane will be made available. This guarantee would not apply to a second vessel simultaneously, however Contractor will make every effort to make a second berth available should Carrier require it. Actual vessel starting times are subject to the prevailing rules of the NYSA/ILA collective bargaining agreement.





**HOWLAND HOOK**

**TERMINAL AGREEMENT; HHCTI & ECUADORIAN  April <u>29</u>, 1997   Page 2**

(2) Adequate yard space for receiving, delivering, parking, sorting, consolidating and handling loaded and empty containers on chassis and without chassis, as required.

(3) Shoreside container gantry cranes suitable to handle containers up to 40 ton capacity. Contractor guarantees immediate availability of 2 cranes upon arrival of Carrier's vessel, Wednesday, Thursday and Friday. On any other day, vessel will be given priority for a berth, and at least one crane will be made available. Additional cranes if available, shall be provided upon Carrier's request. This guarantee does not apply to a second vessel simultaneously, however Contractor will make every effort to make cranes available for a second vessel should Carrier require it. Actual vessel starting times are subject to the prevailing rules of the NYSA/ILA collective bargaining agreement.

(4) Adequate warehouse space, temperature and humidity controlled, adequate handling equipment and personnel in the on-dock container freight station to accommodate Carrier's LCL and perishable cargo requirements, including truck loading.

(5) Contractor shall provide labor, supervision, normal watching service and terminal services.

(6) Contractor shall perform stevedoring services on a 24 hour, 7 day a week basis, consistent with the ILA collective bargaining agreement and the customs and practices currently existing within the Port.

(7) **Truck Turn Time** – With respect to receiving and delivery of full or empty containers, Contractor guarantees a daily average truck turnaround time of 45 minutes per transaction, assuming all documentation is in order, and no extreme weather conditions. Contractor will pay applicable detention charges in the event it shall fail to provide 45 minute service. Detention charges as defined in the Howland Hook Marine Terminal Tariff No.1, shall be billed directly to Contractor.

### 2.2  STEVEDORING

(1) Planning the stowage of uncontainerized cargo and containers on board Carrier's vessels in accordance with the instructions of Carrier's representative, including preparing and furnishing to the Carrier appropriate preliminary and final stowage plans and summaries and data for stability calculations prior to the sailing of vessels.






TERMINAL AGREEMENT; HHCTI & ECUADORIAN **April 29 , 1997 Page 3**

(2) Discharging containers from vessels and moving containers to a point of rest in the yard or in the stack; and moving containers from a point of rest to the wharf and loading same onto vessels.

(3) Opening and closing hatches and cells, the covers of which are to be fitted with ISO fittings to accommodate standard container spreaders.

(4) Checking and tallying containers and seals, notating any damages to containers or seals upon discharge and having vessel sign for same, onto and off of vessels, and shifting containers on board vessels.

(5) Berthing and spotting of vessels, including the necessary labor to handle lines charged in accordance with Exhibit A. Pilotage and tugs shall be arranged and paid for by the Carrier.

(6) Lashing/Unlashing of containers on vessels shall be provided by the Contractor, if requested by the Carrier, pursuant to rates set forth in Exhibit A.

(7) Howland Hook will work in any reasonable weather condition, including moderate rain and snow, which will still permit safe cargo operation, subject to the permission of the Master of the vessel or the Carrier's Representative.

### 2.3   CONTAINER YARD ACTIVITY

(1) Planning layout of containers in terminal yard and providing Carrier with on-hand dock receipt tally report.

(2) Sorting and consolidating in accordance with Carrier's operating requirements.

(3) All necessary maintenance, sanitary, janitorial and clean-up services at the wharf, in the container yard and in the container freight station and the warehouse.

### 2.4   GATE ACTIVITY

(1) Receiving and delivering loaded and empty containers on chassis to a point of rest in the yard.

