UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------X
SOUTH PACIFIC SHIPPING CO. LTD (d/b/a
Ecuadorian Line) and PACIFIC FRUIT INC.,

                Plaintiffs,        Docket No.: 07 Civ. 6317 (GEL)

      - against -

NEW YORK CONTAINER TERMINAL, INC.,
                    Defendant.
----------------------------------------------------------X


## DEFENDANT'S MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

## TABLE OF CONTENTS

FACTS ........................................................................................................................................1

ARGUMENT ...............................................................................................................................9

    PLAINTIFFS DO NOT MEET THE STANDARD FOR
    A PRELIMINARY INJUNCTION..................................................................................9

       I.      Plaintiffs Cannot Demonstrate Irreparable Injury......................................10

       II.     Plaintiffs Cannot Demonstrate Likelihood of
            Success on the Merits..................................................................................12

           A.    NYCT Did Not Breach its Contract with
                 South Pacific ........................................................................................12

               1.     South Pacific has altered the pro forma
                     on which the terms and rates agreed to
                     by the parties in the Confidential Rate
                     Schedule were based ......................................................13

               2.     South Pacific has exceeded the commercially
                       reasonable restrictions on output on
                       non-containerized, palletized bananas ...........................18

           B.    NYCT Did Not Tortiously Interfere with
                 Contracts ..............................................................................................21

       III.    Plaintiffs Cannot Demonstrate Sufficiently Serious
            Questions Going to the Merits to Make Them a
            Fair Ground for Litigation and That the Balance
            of the Hardships Tips Decidedly in their Favor.........................................23

CONCLUSION..............................................................................................................................25

## TABLE OF AUTHORITIES

**Cases**

*Aetna Cas. and Sur. Co. v. Aniero Concrete Co., Inc.*, 404 F.3d 566 (2d Cir. 2005)....... 18

*Argo Corp. v. Greater N.Y. Mut. Ins. Co.*, 4 NY3d 332 .................................................. 17

*Bronx Household of Faith v. Bd. of Educ.*, 331 F.3d 342 (2d Cir. 2003) ......................... 9

*Carvel Corp. v. Noonan*, 3 N.Y.3d 182, 818 N.E.2d 1100, 785 N.Y.S.2d 359 (N.Y. 2004)
.......................................................................................................................................... 22

*Commodex Systems Corp. v. GTE Telenet Communications Corp.* 543 F.Supp. 164
(S.D.N.Y. 1982).............................................................................................................. 11

*Consolidated Brands, Inc. v. Mondi*, 638 F.Supp. 152 (E.D.N.Y. 1986) ......................... 10

*Energy Tactics, Inc., v. Niagara Mohawk Power Corp.*, 219 A.D.2d 577, 631 N.Y.S.2d
697 (2d. Dept. 1995)....................................................................................................... 20

*Firemen's Ins. Co. of Newark, New Jersey v. Keating*, 753 F.Supp. 1146 (S.D.N.Y. 1990)
.......................................................................................................................................... 11

*Fonar Corp. v. Magnetic Resonance Plus, Inc.,* 957 F.Supp. 477 (S.D.N.Y.1997)......... 22

*Furness Withy (Chartering) Inc. v. World Energy Systems Associates. Inc.,* 772 F.2d 802
(11th Cir. 1985), cert. denied, 489 U.S. 1013, 109 S.Ct. 1124, 103 L.Ed.2 186 (1989)
.......................................................................................................................................... 21

*G.K.A. Beverage Corp. v. Honickman*, 55 F.3d 762 (2d Cir. 1995)................................. 22

*Huntington v. Marsh*, 884 F.2d 648 (2d Cir. 1989), cert. denied, 494 U.S. 1004, 110 S.Ct.
1296, 108 L.Ed.2d 473 (1990)........................................................................................ 10

*In re Arbitration Between Herlofson Mgmt. A/S and Ministry of Supply, Kingdom of
Jordan*, 765 F.Supp. 78 (S.D.N.Y. 1991) ...................................................................... 17

*International Minerals and Resources, S.A. v. Pappas*, 96 F.3d 586 (2d Cir. 1996) ...... 21

*Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.*, 596 F.2d 70 (2d Cir. 1979) ................... 10

*Jews for Jesus, Inc. v. Jewish Community Relations Council*, 968 F.2d 286 (2d Cir. 1992)
.................................................................................................................................... 22, 23

*Kaplan v. Board of Education*, 759 F.2d 256 (2d Cir. 1985) .......................................... 10

*Klewin Bldg. Co., Inc. v. Heritage Plumbing & Heating, Inc.* 2007 WL 2191341 (2d
Dept. 2007) ..................................................................................................................... 18

*Kronos, Inc. v. AVX Corp.*, 81 N.Y.2d 90, 595 N.Y.S.2d 931, 612 N.E.2d 289 (1993) .. 22

*Lusk v. Village of Cold Spring*, 475 F.3d 480 (2d Cir. 2007) ........................................... 9

*Mazurek v. Armstrong*, 520 U.S. 968, 117 S.Ct. 1865, 138 L.Ed.2d 162 (1997).............. 9

*Ministry of Industry and Trade v. S. Kasmas & Bros., Ltd.,* 2001 WL 1035133 (S.D.N.Y.
2001) ............................................................................................................................... 17

*On Tap Premium Quality Waters v. Bank of Northern Illinois*, 262 Ill. App. 3d 254, 634
N.E.2d 425 (2d Dist. 1994)............................................................................................. 23

*Oppenheimer & Co. v. Oppenheim, Appel, Dixon & Co.,* 86 N.Y.2d 685 ...................... 17

*Orange and Rockland Utilities v. Amerada Hess Corp.*, 59 A.D.2d 110, 397 N.Y.S.2d
814, (2d. Dept. 1977)...................................................................................................... 19

*Philadelphia Corporation et al. v. Niagara Mohawk Power Corp.*, 207 A.D.2d 176, 621
N.Y.S.2d 237 (3d. Dept. 1995)....................................................................................... 19

*Piccoli A/S v. Calvin Klein Jeanswear Co.*, 19 F.Supp.2d 157 (S.D.N.Y.1998).............. 22

*Preferred Mtge. Brokers v. Byfield*, 282 A.D.2d 589 ...................................................... 17

*Random House, Inc. v. Rosetta Books LLC*, 283 F.3d 490 (2d Cir. 2002) ....................... 24

*Solow v. Stone*, 994 F.Supp. 173 (S.D.N.Y. 1998) .......................................................... 23
*Sussman v. Crawford*, 488 F.3d 136 (2d Cir. 2007) ........................................................... 9
*Thypin Steel Co. v. Certain Bills of Lading,* 1998 WL 912100 (S.D.N.Y. 1998) ............ 21
*Tucker Anthony Realty Corp. v. Schlesinger*, 888 F.2d 969 (2d Cir. 1989) ..................... 10
*Vitex Mfg. Corp.v. Caribtex Corp*., 377 F.2d 795 (3d. Cir. 1967)................................... 19

**Other Authorities**

Restatement (Second) of Torts (1977) § 766 ..................................................................... 21
Uniform Commercial Code §2-306 ................................................................................... 18

**Treatises**

22 N.Y.Jur. 2d Contracts § 230........................................................................................ 20
A Callmann on Unfair Competition, Trademarks & Monopolies, Vol. 1 § 9.5 ............... 23
Calamari and Perillo, Contracts (3d ed.).................................................................... 18, 19
Williston on Contracts, Vol. 23 §63:22 (4th ed.)............................................................. 20

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------X
SOUTH PACIFIC SHIPPING CO. LTD (d/b/a
Ecuadorian Line) and PACIFIC FRUIT INC.,

                    Plaintiffs,          Docket No.: 07 Civ. 6317 (GEL)

      - against -

NEW YORK CONTAINER TERMINAL, INC.,
                      Defendant.
-----------------------------------------------------------X

### DEFENDANT'S MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

Defendant New York Container Terminal ("NYCT") respectfully submits this

Memorandum of Law in Opposition to Plaintiffs' Motion for a Preliminary Injunction.

#### Facts

NYCT is the successor to Howland Hook Container Terminal, Inc. ("HHCTI")

which, as lessee from The Port Authority of New York and New Jersey (the "Port

Authority"), reopened and refurbished the Howland Hook Container Terminal (the

"Terminal") beginning at the end of 1995. In January 2005, NYCT was formed as the

successor lessee of HHCTI and took over the operation and management of the Terminal

which was renamed "New York Container Terminal."[1]

The Terminal was a party to a certain Terminal Operating, Stevedoring and CFS

(Container Freight Station) Service Agreement, made as of April 29, 1997, between

HHCTI and South Pacific (the "Stevedoring Contract"). Pursuant to Section XIX

thereof, the initial term of the Stevedoring Contract was for eight (8) years and expired on

September 30, 2005 (the "Initial Term"). The Stevedoring Contract afforded South

---

[1] Most of the fact herein are taken directly from the August 6, 2007 Declaration of James J. Devine, President and Chief Executive Officer of NYCT.

Pacific an option to renew for an additional term of five (5) years. Upon receipt of notice

of an intention to renew by South Pacific, NYCT prepared, tendered, and negotiated with

South Pacific an extension of the Stevedoring Contract for a further term of five (5) years

commencing as of October 1, 2005 in the form of Exhibit A to the Contract (Confidential

Stevedoring Rate Schedule for Ecuadorian Line), dated as of October 1, 2005 (the

"Confidential Rate Schedule"). Although Exhibit A was to have effect as of October 1,

2005, it was not executed by South Pacific until December 5, 2006 and by NYCT on

December 26, 2006 following various negotiations between the parties.

   Pursuant to the Stevedoring Contract, the Terminal agreed to provide and erect a

dedicated warehouse space of approximately 66,400 square feet, at least 50,000 square

feet of which was to be refrigerated, in order to store South Pacific's cargo at the

Terminal. The warehouse was constructed in accordance with plans and specifications

approved by South Pacific prior to the execution of the Contract and was required to be

located adjacent to the guaranteed berth for South Pacific's vessels. The cost of the

construction of the warehouse, known at the Terminal as the "Banana Building," was

financed primarily by the Port Authority and the New York City Economic Development

Corporation with contributions by each of South Pacific and the Terminal. The rent for

the Banana Building was to be included in the per-box stevedoring rate provided in the

Contract. The Banana Building was completed on or about July, 1999 and occupied by

South Pacific's operations.

   The Banana Building  was constructed "in accordance with the plans and

specifications approved by [South Pacific]" (Stevedoring Contract Section 2.5). The

Stevedoring Contract provided that "the height of the warehouse should be sufficient to

2

convert to a rack system for a second level of pallets" (Contract Section 2.5). The initial design, however, required by South Pacific involved only one level of pallets. The capacity of the Banana Building was limited by South Pacific's own design requirements to approximately 1,750 pallets, and no increase of capacity to a rack system for a second level of pallets had been initiated at the time of negotiation and execution of the Confidential Rate Schedule. The capacity of the Banana Building to hold refrigerated fruit was approximately 1,750 pallets and remains so to this day.

Because South Pacific is able to arrange for some palletized cargo to immediately be moved through the Banana Building to trucks and because the Terminal could provide some stuffing of refrigerated containers to handle the overflow, it is within the ability of the Terminal to handle about 2,000 pallets per vessel call within the time, labor, and space limitations contemplated by the Stevedoring Contract and the Confidential Rate Schedule.

From at least 2000 through 2006, South Pacific employed its Island Class vessels in service to the Terminal. These vessels departed Ecuador with full loads of bananas and fruit, stowed both in containers on deck and in reefer compartments below deck. Upon arrival, the containers were readily discharged in about three hours, and within the same day approximately 2,000 pallets of bananas in cartons were also discharged into the Banana Building, some partly directly into trucks, and some into refrigerated containers set up at the Terminal. The capacity of non-containerized, palletized cargo on the Island Class is approximately 4,000 pallets; and from the Terminal, the vessels sailed to Europe with the remaining 2,000 pallets aboard. The relationship between South Pacific and the

Terminal remained uneventful through the end of 2006 as South Pacific continued to use its Island Class vessels to call at the Terminal in the above pattern.

In January 2007, South Pacific removed the Island Class vessels from their former rotation, substituting the Ocean Class vessels which theretofore had been sent directly from Ecuador to Europe. This change in vessels had a significant negative effect on NYCT's operations.

The most significant difference between the Island Class and Ocean Class vessels was that, because the Ocean Class vessels carried far fewer containers, their entire cargo of palletized, non-containerized cargo was suddenly offloaded beginning in January 2007 at the Terminal. The Ocean Class vessels contained a substantially different mix of non-containerized palletized bananas than did the Island Class vessels. Whereas the Island Class vessels discharged approximately 2000 pallets and 160 containers per call, the Ocean Class vessels discharged approximately 4000 pallets and only approximately 66 containers per call. Stevedoring pallets as opposed to refrigerated containers is much more labor- and equipment-intensive and has taxed the resources of NYCT which, as noted above, could only handle approximately 2,000 non-containerized pallets per vessel call within the time, labor, and space limitations contemplated by the Stevedoring Contract and the Confidential Rate Schedule.

From January to July 2007, the Terminal received from the Island Class vessels, approximately double the number of non-containerized, palletized boxes of bananas than in comparable months in the proceeding six years. For each of the first seven months of each year between 2001 to 2006, South Pacific tendered non-containerized pallets containing an average of 350,886 boxes of fruit, while for each of the same seven (7)

months in 2007 (January-July), South Pacific tendered non-containerized pallets containing 706,656 boxes. This represents a difference of 355,770 boxes per month, more than twice (or 200%) the number of boxes from non-containerized pallets tendered for stevedoring and terminal services during the comparable periods in the prior six (6) years. By July 2007, South Pacific had tendered nearly 3 million more boxes of non-containerized, palletized bananas than in the six previous years.

The Ocean Class vessels also differed from the Island Class vessels in other materially significant respects. The Ocean Class vessels do not initially "allow for the use of four electric fork lift trucks in the hatch" as the Island Class vessels did, and as explicitly required by the Confidential Rate Schedule. In fact, a maximum of one electric fork lift truck can be used at one time in one of the hatches on the Ocean Class vessels, and the other hatches can initially be worked with a maximum of two electric fork lift trucks. This means that the vessels take much longer to unload.

Nor are the Ocean Class vessels "pallet friendly", as were the Island Class vessels and as explicitly required by the Confidential Rate Schedule. In fact, they contain steel partitions around which the workers must maneuver in order to discharge the pallets. The Ocean Class vessels do not permit configuration of cargo so that "at least one-half of each hatch square is to be pre-slung," as did the Island Class vessels and as explicitly required by the Confidential Rate Schedule. Instead, only approximately one-third of each hatch square on the Ocean Class vessels is pre-slung.

For all of the above reasons, the Ocean Class vessels are incapable of being fully worked (discharged and loaded) within two days (and within one day under special circumstances) as were the Island Class vessels (when normally discharging 2,000 non-

containerized pallets) and as explicitly required by the Confidential Rate Schedule.
Instead, the Ocean Class Vessels require two-and-a-half (2 ½) to three (3) days for
discharge and loading, despite the fact that NYCT has worked them with multiple gangs
and overtime. The Island Class vessels, by contrast, could be fully worked in less than
twenty-four (24) hours, and were generally worked within 24 to 36 hours.

The rates and terms of the Stevedoring Contract and the Confidential Rate
Schedule were never intended to apply to a monthly cargo throughput of 4000 non-
containerized pallets--more than twice the number of non-containerized pallets of fruit
previously handled at NYCT's Terminal. This is especially evident since the refrigerated
capacity of the Banana Building, which was built to South Pacific's design and to service
its throughput, can only accommodate approximately 1750 non-containerized pallets of
fruit. Such permanent refrigerated capacity has not increased at all, necessitating that
NYCT take extraordinary measures upon the discharge of each vessel to provide the
required refrigeration using containers for more than double the number of non-
containerized pallets which can be accommodated in the Banana Building.

Nor were the rates and terms of the Stevedoring Contract and the Confidential
Rate Schedule intended to apply where the vessels used by South Pacific, in direct
violation of the Stevedoring Contract and the Confidential Rate Schedule: 1) were
incapable of being fully worked within two days (and within one day under special
circumstances); 2) were not "pallet friendly"; 3) did not allow for the use of four electric
fork lift trucks in each of the ship's hatches; and 4) were not configured so that "at least
one-half of each hatch square is to be pre-slung."

6

Although the Stevedoring Contract and Confidential Rate Schedule provide for payments based on volume of the cargo handled and the services rendered, these charges do not nearly compensate NYCT for loss of productivity and extra costs associated with the increased volume of pallets and the fact that the Ocean Class vessels are less easily worked.

Furthermore, NYCT also has great difficulty in finding sufficient labor to meet the requirements of South Pacific's Ocean Class Vessels. Whereas the Island Class Vessels required, at the most, two gangs to work the vessel, the Ocean Class Vessels have required three and even four gangs even in order to complete work within 2 ½ to 3 days (greater than the amount of time required under the Confidential Rate Schedule). On certain days when container vessels call at the Terminal, NYCT does not have enough labor gangs to work both the container vessels and South Pacific's vessel at the same time.[2]

While NYCT would have had sufficient labor to work South Pacific's Island Class vessels based on the pro forma, the combination of the following circumstances means that NYCT will not have sufficient labor to work South Pacific's vessels if South Pacific is to continue having its vessels arrive on a Wednesday, Thursday or Friday: 1) the Ocean Class Vessels require so much more labor and take so much longer to work, 2) the Terminal has new business coming as of this week (which new business, as plaintiffs well know, NYCT had been negotiating for approximately three years), and

---

[2] Terminals do not control the sourcing of their own labor. The provision of labor to a container terminal in this Port is controlled by the unions. Union labor and assignments to labor gangs gravitates towards container vessels because the pay is more lucrative, the conditions safer, the work easier, and many longshoremen no longer have any breakbulk experience. While extra labor can be requested from union locals in Brooklyn, Manhattan, and Bayonne there is no assurance of procuring adequate and qualified labor on a regular basis or that such labor has the requisite skills to discharge breakbulk cargo and to operate the necessary equipment.

3) the provision of labor gangs are controlled by unions, as discussed above.

Forcing NYCT to work the Island Class vessels, particularly on a Wednesday, Thursday or Friday arrival schedule, also raises safety concerns. The general condition of South Pacific's Ocean Class vessels leaves much to be desired. Broken deck plates, confined working areas, and other conditions precipitate concerns over safety in discharging the vessels.

South Pacific's January 2007 switch in vessels and doubling of the previous throughput of non-containerized, palletized bananas materially altered the pro forma on which the rates and terms in the Confidential Rate Schedule were based, and violated the express conditions of the Confidential Rate Schedule. Further, South Pacific has made a commercially unreasonable increase in its output of non-containerized, palletized bananas. South Pacific's failure to pay reasonable additional amounts to compensate NYCT for NYCT's increased labor, equipment and productivity costs, and to make reasonable adjustments to its delivery schedule, constitutes a breach of contract.

Since South Pacific, and not NYCT, has breached the parties' contract, plaintiffs cannot show "likelihood of success on the merits" of their contract claim. Further, plaintiffs cannot state a claim for tortious interference with contract or prospective business relations. Nor can plaintiffs demonstrate the "irreparable harm" necessary for grant of a preliminary injunction, as any harm to them resulting from failure to grant an injunction is compensable in money damages, and any alleged "irreparable harm" is of their own making. Finally, plaintiffs cannot demonstrate "sufficiently serious questions going to the merits to make them a fair ground for litigation and that the balance of

hardships tip decidedly in [plaintiffs'] favor." Plaintiffs' motion for a preliminary injunction must be denied.

## ARGUMENT

### PLAINTIFFS DO NOT MEET
### THE STANDARD FOR A PRELIMINARY INJUNCTION

"[A] preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a *clear showing,* carries the burden of persuasion." *Mazurek v. Armstrong,* 520 U.S. 968, 972, 117 S.Ct. 1865, 138 L.Ed.2d 162 (1997) (emphasis in original); *Sussman v. Crawford,* 488 F.3d 136, 139 -140 (2d Cir. 2007). To obtain a preliminary injunction a party must demonstrate: (1) that [he or she] will be irreparably harmed if an injunction is not granted, and (2) either (a) a likelihood of success on the merits or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation, and a balance of the hardships tipping decidedly in its favor. *Bronx Household of Faith v. Bd. of Educ.,* 331 F.3d 342, 348-49 (2d Cir.2003). *Lusk v. Village of Cold Spring,* 475 F.3d 480, 485 (2d Cir. 2007).

As the accompanying Declarations of James Devine and Joseph Cordero demonstrate, and the testimony to be adduced at the preliminary injunction hearing will show, NYCT has not breached its contract or committed any tortious behavior. Rather, South Pacific has breached the parties' contract by: 1) substituting its Ocean Class vessels for Island Class vessels, doubly increasing the weekly non-containerized pallet throughput of bananas and generating at least an additional $80,000 per month in labor and equipment costs; and 2) refusing to pay reasonable additional charges or alter its delivery schedule, as the Stevedoring Contract, as modified by the Confidential Rate Schedule, mandates and as the parties contemplated South Pacific would do if it

9

materially changed the pro forma.[3] As NYCT has not breached its contract or committed

a tort, plaintiffs cannot show likelihood of success on the merits or that there are

"sufficiently serious questions going to the merits to make them a fair ground for

litigation." Nor can plaintiffs demonstrate that if a preliminary injunction is not granted,

they will be irreparably harmed, as any harm is compensable in money damages. As

plaintiffs meet neither of the requirements for a preliminary injunction, this

"extraordinary and drastic remedy" should not be imposed.

**I    Plaintiffs Cannot Demonstrate Irreparable Injury**

The burden a plaintiff in this Circuit must meet to demonstrate irreparable injury

is an "extremely high" one:

> The Second Circuit has consistently stressed that in order to be deemed
> "irreparable," so as to warrant the granting of injunctive relief, the harm alleged
> by the movant "must be one requiring a remedy of more than mere monetary
> damages. A monetary loss will not suffice unless the movant provides evidence of
> damage that cannot be rectified by financial compensation." *Tucker Anthony
> Realty Corp. v. Schlesinger*, 888 F.2d 969 (2d Cir. 1989).; see also *Huntington v.
> Marsh*, 884 F.2d 648, 651 (2d Cir.1989), cert. denied, 494 U.S. 1004, 110 S.Ct.
> 1296, 108 L.Ed.2d 473 (1990); *Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.*,
> 596 F.2d 70, 72 (2d Cir.1979) ("irreparable injury means injury for which a
> monetary award cannot be adequate compensation."). Furthermore, "[t]o establish
> irreparable harm, plaintiffs must demonstrate 'an injury that is neither remote nor
> speculative, but actual and imminent.' " *Tucker Anthony*, supra, 888 F.2d at 975,
> (quoting *Consolidated Brands, Inc. v. Mondi*, 638 F.Supp. 152, 155
> (E.D.N.Y.1986)); accord *Kaplan v. Board of Education*, 759 F.2d 256, 259 (2d
> Cir.1985). Finally, the Second Circuit has emphasized that it is not sufficient for a
> movant to demonstrate merely the possibility of irreparable harm. "An applicant
> for a preliminary injunction must show that it is likely to suffer irreparable harm if
> equitable relief is denied." *JSG Trading Corp. v. Tray-Wrap Inc.*, 917 F.2d 75 at
> 79 (emphasis in original). Thus, the standard that movant must meet is extremely
> high.

---

[3] NYCT filed its Answer and Counterclaims in this action on July 31, 2007. NYCT's counterclaims allege
Breach of Contract, Breach of Outputs Contract, Breach of Implied Contract of Good Faith and Fair
Dealing, Unjust Enrichment/Quantum Meruit, Tortious Interference with Contracts, and Tortious
Interference with Prospective Business Relations.

*Firemen's Ins. Co. of Newark, New Jersey v. Keating,* 753 F.Supp. 1146, 1150 (S.D.N.Y. 1990).

Moreover, if the alleged "irreparable injury" is, as here, a consequence of plaintiff's own making, and the alleged injury, but for plaintiff's actions, could have been rectified by money damages, a court will not find "irreparable injury" and grant a preliminary injunction. *Commodex Systems Corp. v. GTE Telenet Communications Corp.* 543 F.Supp. 164 (S.D.N.Y. 1982). *Commodex* is on all fours with the instant case. In *Commodex*, plaintiff refused to pay for computer equipment and services, alleging that defendant had breached its contract and defrauded it, and then moved for a preliminary injunction to require defendant to continue to provide it services. The Court refused to grant the injunction, holding:

> Plaintiff's application for a preliminary injunction is denied because it appears that plaintiff's alleged irreparable injury is a consequence of its own making. It could have prevented termination of service by making the payments demanded by defendant. If plaintiff believed that it was defrauded into purchasing the equipment, that defendant breached its contract or warranties or that defendant received payments to which it was not entitled, its remedy was and is a suit for damages. Instead, plaintiff chose not to pay for the equipment which it was using. Having done so, and having suffered a termination of service, plaintiff cannot now be heard to complain that its injury is irreparable. It cannot through its own conduct transform an injury compensable in money damages into an irreparable injury.

543 F.Supp. at 165.

As in *Commodex,* the alleged "irreparable injury" here is entirely of South Pacific's own making. South Pacific could have: a) maintained its throughput of non-containerized, palletized bananas at a level commensurate with the level prior to January, 2007, and at the capacity of the "Banana Building"; b) made (and could still make) the reasonable additional payments demanded by NYCT to compensate NYCT

11

for the additional costs, labor and equipment required to service the Ocean Class

vessels, as the parties and their contract envisioned; or c) adjusted its delivery schedule,

as requested by NYCT, so that the additional labor and equipment required to service

the Ocean Class vessels could be made available and would not interfere with the

operation of the Terminal and NYCT's other customers.  As in *Commodex*, plaintiff

"could ...prevent termination of service by making the payments demanded by

defendant" and altering its schedule to arrive earlier in the week (which would not in

any way damage its produce; see Declaration of Patrick Brecht, Ph.D).  If the ultimate

fact finder herein finds that plaintiffs' position on their substantive causes of action was

correct, plaintiffs' remedy is in money damages.  However, plaintiffs cannot "through

[their] own conduct transform an injury compensable in money damages into an

irreparable injury".  *Commodex, supra.*

## II    Plaintiffs Cannot Demonstrate Likelihood of Success on the Merits

### A.    NYCT Did Not Breach its Contract with South Pacific

NYCT did not breach its contract with South Pacific by demanding: 1) that South

Pacific pay reasonable additional amounts in order to compensate NYCT for the

additional labor, equipment, and loss of productivity it incurred due to South Pacific's

January 2007 substitution of  Island Class for Ocean Class vessels; and 2) that South

Pacific alter its delivery schedule when it became clear that the Ocean Class vessels

required so much additional labor, equipment and time that NYCT could not service them

in accordance with the original schedule.  The Stevedoring Contract, as modified by the

Confidential Rate Schedule, is predicated upon a pro forma (an existing standard of

operations and level of throughput) remaining the same, and the parties contemplated that

South Pacific would pay additional amounts or make other adjustments if the pro forma was materially altered.

In fact, it is South Pacific which has breached the parties' contract, by refusing to pay reasonable additional amounts which were incurred due to its vessel change, increased throughput (doubling) of non-containerized, palletized bananas, and consequent increased costs, and by refusing to adjust its delivery schedule. Additionally, South Pacific's doubling of the throughput of non-containerized, palletized bananas due to its vessel change was a commercially unreasonable increase in output per vessel, and South Pacific's refusal to pay reasonable additional amounts or to make reasonable adjustments in its delivery schedule therefor constituted a breach of contract.

1.    **South Pacific has altered the pro forma on which the terms and rates agreed to by the parties in the Confidential Rate Schedule were based**

The terms and rates agreed to by the parties in the Confidential Rate Schedule were based upon the pro forma, an existing standard of operations and level of throughput, between the parties. The explicit language of the Confidential Rate Schedule states "**Based on current pro forma**, vessel will have two days to complete work." (emphasis added), and also provides:

> The rates quoted are predicated on a pallet friendly vessel which allows for the use of four electric fork lift trucks in the hatch and ship's cranes or derrick with minimum eight metric ton lifting capacity. At least one-half of each hatch square is to be pre-slung.

The Confidential Rate Schedule was negotiated and agreed upon based upon a standard: the then-presently existing manner of operation for South Pacific's vessel calls and cargo throughput at the time the Confidential Rate Schedule was negotiated. This standard was identified in the Confidential Rate Schedule as the "current pro forma" *i.e.*,

13

the model which provided the basis for the rendering and pricing of services and the procurement and assignment of longshore labor.

The pro forma on which the terms and rates set forth in the Confidential Rate Schedule were based[4] included the following items, among others, all of which applied to the Island Class vessels and their manner of operation: 1) discharge of approximately 2000 non-containerized pallets of bananas or other cargo from the vessel; 2) discharge of approximately 160 containers from the vessel; 3) that the vessel be capable of being fully worked (discharged and loaded) within two days (and within one day under special circumstances); 4) that the vessel be "pallet friendly"; 5) that the vessel "allow for the use of four electric fork lift trucks in the hatch"; and 6) that the vessel's cargo be configured so that "at least one-half of each hatch square is to be pre-slung."

The parties understood that the rates and terms stated in the Confidential Rate Schedule **were predicated on the current pro forma** and would apply only if the current pro forma was maintained. If the current pro forma was altered, rates and terms stated in the Confidential Rate Schedule would not apply.

Beginning in January, 2007, South Pacific substantially departed from the pro forma by substituting "Ocean Class" vessels for the "Island Class" vessels that it had predominantly been using since January 2000 to transport its cargo to NYCT, with few

---

[4] The pro forma on which the terms and rates set forth in the Confidential Rate Schedule were based had been in place since January, 2000, when South Pacific began using five "Island Class" vessels to deliver bananas on a weekly basis to NYCT. A South Pacific vessel arrived each week, generally on Thursday or Friday, discharged approximately ½ of the bananas aboard (about 2000 pallets and 160 containers), and departed generally within 24 hours of arrival at NYCT for Europe, where it discharged the remainder of the bananas. Another South Pacific vessel generally arrived at NYCT on a Tuesday of each week from Europe to pick up container cargo that was delivered to Ecuador. See Exhibit B to the Devine Declaration (Notice from Gary White of South Pacific to Frank Chimento and Frank Scollo of Howland Hook [NYCT's predecessor]). This notice describes the pro forma and lists the specifications for the five Island Class vessels that South Pacific used from January, 2000 to December, 2006.

minor exceptions due to drydocking schedules. Ocean Class vessels contained far fewer containers and a substantially different mix of non-containerized palletized bananas than did the Island Class vessels. Whereas the Island Class vessels discharged approximately 2000 pallets and 160 containers per call, the Ocean Class vessels discharged approximately 4000 pallets and only approximately 66 containers per call. Stevedoring pallets as opposed to refrigerated containers is much more labor- and equipment-intensive and has taxed the resources of NYCT which can only handle approximately 2,000 non-containerized pallets per vessel call within the time, labor, and space limitations contemplated by the Stevedoring Contract and the Confidential Rate Schedule.

South Pacific has also violated the pro forma in other respects. The Ocean Class vessels, which South Pacific began predominantly using in January 2007 do not initially "allow for the use of four electric fork lift trucks in the hatch" as the Island Class vessels did, and as explicitly required by the Confidential Rate Schedule. In fact, a maximum of one electric fork lift truck can be used at one time in one of the hatches on the Ocean Class vessels, and the other hatches can initially be worked with a maximum of two electric fork lift trucks. This means that the vessels take much longer to unload. Ocean Class vessels also are not "pallet friendly", as were the Island Class vessels and as explicitly required by the Confidential Rate Schedule. In fact, they contain steel partitions around which the workers must maneuver in order to discharge the pallets. The Ocean Class vessels do not permit configuration of cargo so that "at least one-half of each hatch square is to be pre-slung," as did the Island Class vessels and as explicitly

15

required by the Confidential Rate Schedule. Only approximately one-third of each hatch square on the Ocean Class vessels is pre-slung.

For all of the above reasons, the Ocean Class vessels are incapable of being fully worked (discharged and loaded) within two days (and within one day under special circumstances) as were the Island Class vessels (when normally discharging 2,000 non-containerized pallets) and as explicitly required by the Confidential Rate Schedule. Instead, the Ocean Class Vessels require two-and-a-half (2 ½) to three (3) days for discharge and loading, despite the fact that NYCT has worked them with multiple gangs and overtime. The Island Class vessels, by contrast, could be fully worked in less than twenty-four (24) hours, and were almost always worked within thirty six (36) hours.

The rates and terms of the Stevedoring Contract and the Confidential Rate Schedule were never intended to apply to a monthly cargo throughput of 4000 non-containerized pallets--more than twice the number of non-containerized pallets of fruit previously handled at NYCT's Terminal. This is especially evident since the refrigerated capacity of the Banana Building, which was built to South Pacific's design and to service its throughput, can only accommodate approximately 1750 non-containerized pallets of fruit. Such permanent refrigerated capacity has not increased at all, necessitating that NYCT take extraordinary measures upon the discharge of each vessel to provide the required refrigeration using containers for more than double the number of non-containerized pallets which can be accommodated in the Banana Building.

Nor were the rates and terms of the Stevedoring Contract and the Confidential Rate Schedule intended to apply where the vessels used by South Pacific, in direct violation of the Stevedoring Contract and the Confidential Rate Schedule: 1) were

16

incapable of being fully worked within two days (and within one day under special

circumstances); 2) were not "pallet friendly"; 3) did not allow for the use of four electric

fork lift trucks in each of the ship's hatches; and 4) were not configured so that "at least

one-half of each hatch square is to be pre-slung."

The use of a pro forma contract in the shipping industry is not only common, it is

often essential to the ability to conclude maritime contracts. It has particular application

to the negotiation of charter parties.[5] However, as defendant's witnesses will testify, it

also has application to stevedoring contracts as a standard or model for the performance

of such contracts, particularly because the task of stevedoring a vessel of a certain size

and characteristics may be quite different from what is required to stevedore another.

Moreover, South Pacific's refusal to maintain the pro forma, and to comply with

the terms set forth in the Confidential Rate Schedule, constitute failure to satisfy express

conditions precedent to the contract, and excuses NYCT from performing thereunder. "A

condition precedent is an act or event, other than a lapse of time, which, unless the

condition is excused, must occur before a duty to perform a promise in the agreement

arises" *Argo Corp. v. Greater N.Y. Mut. Ins. Co.,* 4 NY3d 332, 337 n 2. "Express

conditions precedent, which are those agreed to and imposed by the parties themselves,

'must be literally performed'" *Preferred Mtge. Brokers v. Byfield,* 282 A.D.2d 589, 590,

quoting *Oppenheimer & Co. v. Oppenheim, Appel, Dixon & Co.,* 86 N.Y.2d 685, 690).

---

[5] As the Court noted in *Ministry of Industry and Trade v. S. Kasmas & Bros., Ltd.,* 2001 WL 1035133 (S.D.N.Y. 2001), "This Court has described the formation of contracts in the shipping industry as follows: 'Under the custom of the shipping industry, the parties typically base their negotiations on a standard form contract, called the "pro forma charter party." They negotiate on the "main terms," which may include a specification of the pro forma charter party, the names of the charterer and owner, the ship and its characteristics, the time and place of loading and unloading, freight rates, and other terms. When the parties have completed their negotiations, they are said to have a "fixture." The fixture is considered a binding contract, even if it is "subject to details"—that is, even if the less important terms of the charter party remain to be agreed upon.' *In re Arbitration Between Herlofson Mgmt. A/S and Ministry of Supply, Kingdom of Jordan,* 765 F.Supp. 78, 79 n. 1 (S.D.N.Y. 1991) (internal citations omitted)."

17

*Klewin Bldg. Co., Inc. v. Heritage Plumbing & Heating, Inc.* 2007 WL 2191341, 1 (2d Dept.2007). *See also, Aetna Cas. and Sur. Co. v. Aniero Concrete Co., Inc.*, 404 F.3d 566, 597 (2d Cir. 2005) ("A condition precedent is 'an act or event, other than a lapse of time, which, unless the condition is excused, must occur before a duty to perform a promise in the agreement arises' (Calamari and Perillo, Contracts § 11-2, at 438 [3d ed.]). Most conditions precedent describe acts or events which must occur before a party is obliged to perform a promise made pursuant to an existing contract....")

### 2. South Pacific has exceeded the commercially reasonable restrictions on output of non-containerized, palletized bananas

South Pacific has **also** breached the contract by making a commercially unreasonable increase in output of non-containerized, palletized bananas and refusing to pay reasonable additional amounts or make reasonable adjustments in its delivery schedule. NYCT agreed to provide terminal, stevedoring, and other services at the rates set forth in the Confidential Rate Schedule, for the non-containerized, palletized output of bananas South Pacific delivers. However, output contracts are subject to commercially reasonable restrictions, and South Pacific's 2007 delivery of more than **double** the usual number of non-containerized, palletized bananas, requiring that NYCT provide shore side refrigeration by loading them into containers, exceeded the commercially reasonable restrictions, which are based on "normal or otherwise comparable prior outputs".

Section 2-306 of the Uniform Commercial Code ("Output, Requirements and Exclusive Dealings") provides[6]:

---

[6] UCC 2-306, which is part of Article 2 of the UCC, does not directly control NYCT's contract with Ecuadorian, as Article 2 strictly applies only to contracts for the sale of goods, and the NYCT/Ecuadorian contract is a service contract. However, "Article 2 of the Code has increasingly been looked to by courts for guidance in transactions other than the sale of goods. As one Court has stated: 'While this contract is not controlled by the Code, the Code is persuasive here because it embodies the foremost legal though

(1) A term which measures the quantity by the output of the seller or the requirements of the buyer means such actual output or requirements as may occur in good faith, except that no quantity unreasonably disproportionate to any stated estimate or *in the absence of a stated estimate to any normal or otherwise comparable prior output or requirements may be tendered or demanded.* (emphasis added).

This section has been interpreted by New York courts to read a reasonable quantity term into each contract, and to find that the contract can only be enforced for that reasonable quantity. For example, in *Orange and Rockland Utilities v. Amerada Hess Corp.*, 59 A.D.2d 110, 397 N.Y.S.2d 814, (2d. Dept. 1977) the Court held that the Seller under an oil contract (O & R) could refuse to sell oil to the Buyer (Amerada Hess) for the stated contract price per barrel where Hess's oil "requirements" for a given year were more than double the stated estimate in the contract. Under the circumstances of the case, the Court held, this amount was "unreasonably disproportionate" to the contract estimates; the Court dismissed Hess's claim for breach of contract.

Likewise, in *Philadelphia Corporation et al. v. Niagara Mohawk Power Corp.*, 207 A.D.2d 176, 621 N.Y.S.2d 237 (3d. Dept. 1995) the Court held that the buyer to an electricity output contract (Niagara Mohawk) was not required to purchase the entire output of the seller, a hydroelectric power plant (Philadelphia Corp.) under a number of output contracts. For those contracts without stated estimates of quantities, the *Philadelphia Corporation* Court held, "plaintiffs are required to sell and defendant is required to purchase such quantities of electricity as are, in good faith and within the standards of commercial fair dealing, reasonably proportionate and commercially consistent with normal or otherwise comparable prior quantities." Id. at 181. See also

---

concerning commercial transactions.' " Calamari & Perillo, *The Law of Contracts* (4th Ed. 1987) p. 18, citing *Vitex Mfg. Corp. v. Caribtex Corp.*, 377 F.2d 795, 799 (3d. Cir. 1967); see also 1 Corbin § 1.22 ("The Uniform Commercial Code as a Source of Common Law").

*Energy Tactics, Inc., v. Niagara Mohawk Power Corp.*, 219 A.D.2d 577, 631 N.Y.S.2d 697 (2d. Dept. 1995) ("When an output contract is silent as to output approximations or figures, the parties' respective obligations are limited to normal or otherwise comparable prior output or requirements and no quantities unreasonably disproportionate to such amounts may be tendered or demanded"; Court looked to parties' 5-year history to determine that amount of electricity generated in disputed year was comparable to that generated in the average of five previous years, and to rule that contract must be enforced as to that amount.)

Since NYCT's contract with South Pacific included no specific amount of non-containerized, palletized bananas, its obligations under the contract only require NYCT to stevedore and terminal that amount of non-containerized, palletized bananas comparable to the amount processed from 2000-2007, when South Pacific was employing Island Class vessels. NYCT's refusal to stevedore and terminal a greater amount—double the amount tendered for 2001-2007—for the same contract price and under the same delivery conditions does not constitute a breach of contract. By contrast, South Pacific's refusal to pay a higher price for the additional amounts processed, in order to compensate NYCT for its loss in productivity, or to switch to a different pro forma of delivery days constitutes a breach of contract by South Pacific.[7]

---

[7] Additionally, South Pacific's change in vessels and material change in throughput breached the covenant of good faith and fair dealing. "Every contract imposes an obligation of good faith and fair dealing between the parties in its performance and its enforcement, and if the promise of the defendant is not expressed by its terms in the contract, it will be implied. The duty embraces, among other things, an implied obligation that neither party shall do anything to injure or destroy the right of the other party to receive the benefits of the agreement. In determining whether a party has breached the obligation of good faith and fair dealing, a court must examine not only the express language of the parties' contract, but also any course of performance or course of dealing that may exist between the parties." 23 Williston on Contracts § 63:22 (4th ed.). See also 22 N.Y.Jur. 2d Contracts § 230 ("Good faith, fair dealing and co-operation"): "Every contract implies good faith and fair dealing between the parties to it. A duty of co-operation on the part of both parties is also implied in the contract. These principles lead to the implication of various negative

**B.    NYCT Did Not Tortiously Interfere with Contracts**

The Court in *Thypin Steel Co. v. Certain Bills of Lading,* 1998 WL 912100, 5

(S.D.N.Y. 1998), affirmed in part, dismissed in part on other grounds, 215 F.3d 273 (2nd

Cir. 2000) discussed tortious interference with contract in maritime law:

> Federal maritime common law does recognize a claim for tortious interference
> with contract. *Furness Withy (Chartering) Inc. v. World Energy Systems
> Associates. Inc.,* 772 F.2d 802, 807 (11th Cir.1985) (applying Restatement
> (Second) of Torts (1977) § 766 in an admiralty action), *cert. denied,* 489 U.S.
> 1013, 109 S.Ct. 1124, 103 L.Ed.2d 186 (1989). Restatement (Second) of Torts
> (1977) § 766 provides in pertinent part: "[o]ne who intentionally and improperly
> interferes with the performance of a contract... between another and a third person
> by inducing or otherwise causing the third person not to perform the contract, is
> subject to liability to the other for the pecuniary loss resulting to the other from
> the failure of the third person to perform the contract." The Eleventh Circuit in
> *Furness Withy* did not list the elements of a maritime claim of tortious
> interference with contract. However, the New York Court of Appeals has done so
> in the context of New York law, relying on § 766 of the Restatement, and those
> are adopted here: 1) the existence of a contract between plaintiff and a third party;
> 2) defendant's knowledge of the contract; 3) defendant's intentional inducement of
> the third party to breach or otherwise render performance impossible; and 4)
> damages to plaintiff.

See also, *International Minerals and Resources, S.A. v. Pappas,* 96 F.3d 586,

595 (2d. Cir. 1996) (" 'To maintain a successful cause of action for tortious interference

with contract under New York law, a plaintiff must allege and prove the existence of a

valid contract and damages caused by the defendant's knowing and intentional

interference with that contract *without reasonable justification. Jews for Jesus, Inc. v.*

---

covenants, such as that neither party will do anything that will have the effect of destroying or injuring  the
right of the other party to receive the fruits of the contract...."

The course of performance between the parties demonstrated that NYCT expected South Pacific to
continue to use Island Class vessels that would contain a comparable number of non-containerized,
palletized bananas to that it had received in the past and require a comparable degree of manpower to
process.  South Pacific's failure to do so, and failure to pay additional reasonable amounts "injure[d] or
destroy[ed] the rights of [NYCT] to receive the benefits of the agreement" and so constituted a breach of
the covenant of good faith and fair dealing, and hence a breach of contract.  South Pacific's refusal to adjust
its vessel delivery schedule constitutes an additional breach of the covenant of good faith and fair dealing.

*Jewish Community Relations Council*, 968 F.2d 286, 292 (2d Cir.1992). *See also Kronos,*

*Inc. v. AVX Corp.,* 81 N.Y.2d 90, 94, 595 N.Y.S.2d 931, 934, 612 N.E.2d 289 (1993)

(listing four elements: '(1) the existence of a contract between plaintiff and a third party;

(2) defendant's knowledge of the contract; (3) defendant's intentional inducement of the

third party to breach or otherwise render performance impossible; and (4) damages to

plaintiff'").

　　　Plaintiffs plainly cannot state a claim for tortious interference with maritime

contract, or tortious interference with prospective business relations.  Tortious

interference with contracts requires that a defendant (here NYCT) induce a ***third party*** to

breach a contract between that third party and plaintiff.  Neither plaintiff has alleged that

NYCT induced (or would induce) a third party to breach a contract with plaintiff.  Where

there is no allegation or evidence that defendant has targeted a third party with intent to

induce that party to breach contracts with plaintiffs, plaintiffs have not met the elements

of the tort.  *G.K.A. Beverage Corp. v. Honickman*, 55 F.3d 762, 767 -768 (2d Cir. 1995).

The same is true for tortious interference with prospective business relations.  *Carvel*

*Corp. v. Noonan*, 3 N.Y.3d 182, 192, 818 N.E.2d 1100, 1104, 785 N.Y.S.2d 359,

363 (N.Y. 2004) ("As federal courts applying New York law have recognized, conduct

constituting tortious interference with business relations is, by definition, conduct

directed not at the plaintiff itself, but at the party with which the plaintiff has or seeks to

have a relationship.")[8]

---

[8] See also, *Fonar Corp. v. Magnetic Resonance Plus, Inc.,* 957 F.Supp. 477, 482 (S.D.N.Y.1997) ("(U)nder New York law, in order for a party to make out a claim for tortious interference with prospective economic advantage, the defendant must ... direct some activities towards the third party ..."]; *Piccoli A/S v. Calvin Klein Jeanswear Co.,* 19 F Supp 2d 157, 167-168 (S.D.N.Y.1998) (claim must fail because "defendants' alleged conduct concededly was not directed towards any third party with whom Piccoli had an existing or prospective business relationship").

Moreover, "there is no liability for interfering with a relationship between a corporation and its alter ego," 1 A Callmann on Unfair Competition, Trademarks & Monopolies, § 9.5; *On Tap Premium Quality Waters v. Bank of Northern Illinois*, 262 Ill. App. 3d 254, 634 N.E.2d 425 (2d Dist. 1994) and subsidiary corporations are not considered independent "third parties" for purposes of alleging tortious interference with contract; *Solow v. Stone*, 994 F.Supp. 173 (S.D.N.Y. 1998). Ecuadorian Line and Pacific Fruit, Inc. are both companies within the Bonita Group; Carlos Aguirre is President of both companies See Declaration of Mark Jaffe and Declaration of Carlos Aguirre, ¶ 1. NYCT cannot be held liable for tortious interference with South Pacific's "contract" with Pacific Fruit, which is legally considered to be a contract with itself.

Finally, plaintiffs cannot demonstrate NYCT's "knowing and intentional interference" with any contract *without reasonable justification*." *Jews for Jesus, Inc. v. Jewish Community Relations Council*, 968 F.2d 286, 292 (2d Cir.1992). As demonstrated above, NYCT was wholly justified in demanding that South Pacific pay reasonable additional charges or alter its delivery schedule, as contemplated by the parties and their contract, when South Pacific altered the pro forma on which the contract was based.

## III    Plaintiffs Cannot Demonstrate Sufficiently Serious Questions Going to the Merits to Make Them a Fair Ground for Litigation and That the Balance of the Hardships Tips Decidedly in Their Favor

Based on the above, it is clear that plaintiffs cannot demonstrate "sufficiently serious questions going to the merits to make them a fair ground for litigation." Nor does the "balance of hardships tip decidedly in [plaintiffs'] favor." As demonstrated above, any alleged "irreparable injury" to plaintiffs is of their own making, and any harm to

23

them absent an injunction is compensable in money damages. By contrast, if NYCT is forced to service South Pacific's Ocean Class vessels without additional compensation and without an alteration in South Pacific's delivery schedules, 1) NYCT will not have sufficient skilled labor to work South Pacific's vessels; 2) NYCT's ability to service other business in the Terminal will be severely compromised; 3) the significant investment by the Port Authority (funded by tolls on the public) in NYCT to promote NYCT as a premier container terminal in the Northeast will be threatened; and 4) serious safety concerns will be raised. See Devine Declaration ¶¶ 34-45.[9] Taken together, these hardship factors materially affect NYCT's entire business, and far outweigh the harm, compensable in money damages, that plaintiffs may suffer. *Random House, Inc. v. Rosetta Books LLC*, 283 F.3d 490, 492 (2d Cir. 2002).[10]

---

[9] These factors are also "public interest" factors that support NYCT's position that the preliminary injunction should be denied.

[10] As the Court stated in *Random House,* 283 F.3d at 493: "For while Random House expresses fears about harm to its goodwill if Rosetta is allowed to proceed with its sale of ebooks, Rosetta, whose entire business is based on the sale of ebooks, raises a reasonable concern that the proposed preliminary injunction will put it out of business or at least eliminate its business as to all authors who have executed similar contracts. As the district court found, such legitimate concerns outweigh any potential hardships to Random House, *see Random House,* 150 F.Supp.2d at 624, which, if it ultimately prevails on the merits, can recover money damages for any lost sales."

## Conclusion

For all of the aforementioned reasons, Defendant respectfully requests that this Court deny Plaintiffs' motion for a preliminary injunction, enter an order requiring arbitration of this dispute under the terms of the Stevedoring Contract and grant such other and further relief as may be just and proper in the premises.

Dated: New York, New York

August 7, 2007

HILL, BETTS & NASH LLP

By: _____

Mark M. Jaffe (MJ-4855)
Elizabeth A. McCoy (EM-8448)
Gordon S. Arnott (GSA-8612)
Attorneys for Defendant
One World Financial Center
200 Liberty Street, 26th Floor
New York, New York 10281-1003
(212) 839-7000
(212) 466-0514 (fax)

**CERTIFICATE OF SERVICE**

I hereby certify that on this 7th day of August 2007, a copy of the foregoing

Memorandum of Law in Opposition to Plaintiffs' Motion for Preliminary Injunction and

Declaration of Mark Jaffe was served by overnight mail and e-mail upon plaintiffs'

attorneys addressed as follows:

j.keough@waeschelaw.com

j.foster@waeschelaw.com

John R. Keough, III
John R. Foster
Waeche, Sheinbaum & O'Regan
111 Broadway, 4th Floor
New York, NY 10006
(212) 227-3550


By: _____
Elizabeth A. McCoy (EAM-8448)
HILL, BETTS & NASH LLP
One World Financial Center
200 Liberty Street, 26th Floor
New York, New York 10281
Tel. (212) 839-7000
Fax (212) 466-0514